PCGJFRIS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,

       v.                            23 Cr. 180 (KPF)

SERGIO DUARTE FRIAS,

                                      Sentence
           Defendant.

-------------------------------x

                                  New York, N.Y.
                                  December 16, 2025
                                  3:00 p.m.

Before:

                  HON. KATHERINE POLK FAILLA,

                                  District Judge

                        APPEARANCES

JAY CLAYTON
    United States Attorney for the
    Southern District of New York
JANE CHONG
    Assistant United States Attorney

SUSAN J. WALSH
    Attorney for Defendant

Also Present:

Humberto Garcia, Standby Interpreter (Spanish)

PCGJFRIS

(Case called)

MS. CHONG:  Good afternoon, your Honor.

AUSA Jane Chong for the government.

THE COURT:  Good afternoon and thank you.

MS. WALSH:  Good afternoon, your Honor.

I'm Susan Walsh on behalf of Mr. Sergio Duarte Frias.

THE COURT:  Good afternoon to you.  Good afternoon to you, Mr. Duarte Frias.

THE DEFENDANT:  Good afternoon, your Honor.

THE COURT:  Thank you, sir.  Mr. Duarte Frias, I'm going to ask you to bring that microphone a little bit closer to you.

Sir, it is my understanding that there is a standby interpreter for you, but for the moment you wish to proceed in English without translation; is that correct?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  All right.  Mr. Duarte Frias, if at any time you change your mind, please let in our attorney know or please let me know.  Do you understand that, sir?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Thank you.  Let me speak to the parties about what I have and what I should have this afternoon.  I have a presentence investigation report that is dated November 25, 2025.  I have a defense sentencing submission that is dated December 2 of 2025.  It has a number of exhibits

PCGJFRIS

including a letter from Mr. Duarte Frias, a list of books that have been read, listing of programming that he's received or taken, letters from family and supporters, and materials on incarceration.  I also have a government sentencing submission that is dated December 9 of 2025.  And before I took the bench this afternoon, I received a consent preliminary order of forfeiture money judgment.

Ms. Chong, from the government's perspective, is there other material that I should have?

MS. CHONG:  No, your Honor.

THE COURT:  Thank you.  Ms. Walsh, from your perspective is there anything else that I should have?

MS. WALSH:  No, your Honor.

THE COURT:  Ms. Walsh, a few times this afternoon, I will be asking some questions of Mr. Duarte Frias.  I should've asked at the outset because I was just talking to him about it with respect to interpreters, but may I from time to time address your client directly?

MS. WALSH:  Yes, please, your Honor.  Thank you.  No problem.

THE COURT:  Thank you.

Mr. Duarte Frias, as I mentioned, I was handed a document called a consent preliminary order of forfeiture money judgment.  First of all, sir, is that a document that you've seen recently?

PCGJFRIS

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And I'll show you the last page of my version of the document.  I'm holding it up you.  Do you see from where you're seating that there are three signatures on the document?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Is one of those signatures yours, sir?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Before you signed this document, did you read it?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  To the extent you had any questions about it, were you able to resolve those with your attorney, Ms. Walsh?

THE DEFENDANT:  No, your Honor.

THE COURT:  Let me ask that question differently, sir. At the time that you signed this document, did you understand what you were signing?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  And you had counsel available if you had any questions, correct, sir?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Mr. Duarte Frias, I have reviewed this document before I came out on the bench, and I will sign it as well, and we will docket it later today.  Thank you very much.

PCGJFRIS

Let me just also make sure I have certain information in advance that I should have before this proceeding begins. Ms. Chong, has the government reviewed the presentence investigation report in this case?

MS. CHONG:  Yes, your Honor.

THE COURT:  Do you have any objections to its contents?

MS. CHONG:  No, your Honor.

THE COURT:  The one thing I would note is that as to the calculation of the guidelines, as noted in the government's submission, we agree that probation calculated the guidelines correctly, and the parties had a slight error in its calculation.  Yes.  You're standing by your plea agreement, but you're acknowledging that the probation office's guidelines correction is correct?

MS. CHONG:  Correct, your Honor.

THE COURT:  Thank you.  Just while I have you standing, please, on the issue of forfeiture you've answered one of my questions by giving me a consent preliminary order of forfeiture, but I guess I'm wondering if it is contemplated by the government that if there are other convictions in this case, that this figure will be joint and several with other defendants in the case?

MS. CHONG:  Your Honor, it's possible, specifically as to co-conspirator Mario Alberto Jimenez Castro.  This is a

PCGJFRIS

forfeiture figure that we believe would also apply to him, and if he were to be convicted and sentenced we would seek joint and several liability as to this same sum.

THE COURT:  But right now, today, you're not because there's no one else with whom to hold Mr. Duarte Frias jointly and severally liable?

MS. CHONG:  That's correct, your Honor.

THE COURT:  On the issue of restitution, are you seeking restitution today?

MS. CHONG:  We are not, your Honor.

THE COURT:  Okay. I'll come back to you later.  Thank you so much.

Ms. Walsh, turning to you, please, has the defense -- have you had a sufficient opportunity under Federal Rule of Criminal Procedure 32 to review the presentence investigation report in this case?

MS. WALSH:  Yes, your Honor, I have.

THE COURT:  Do you have any objections to its contents?

MS. WALSH:  My objections were incorporated in the final draft with the exception of the lamentable miscalculation of the guidelines.  And I appreciate the government's position on the guidelines, that that stipulated guideline is one that they'll stand by.  But I also concede that the probation report is correct in its calculations.

PCGJFRIS

THE COURT:  I appreciate knowing that.  Let me just, before you sit down, a few more questions for you.

MS. WALSH:  Yes.

THE COURT:  At the back of the presentence investigation report, there are mandatory, standard, and special conditions of supervised release.  Have you reviewed those with Mr. Duarte Frias?

MS. WALSH:  Yes, your Honor.

THE COURT:  And do you have any objections to the conditions of supervised release?

MS. WALSH:  I do not, your Honor.

THE COURT:  Let me be more specific, please, because that would have been more helpful.  There are suggested special conditions including compliance with the immigration laws and the directives of immigration authorities, a search condition in certain circumstances, and a recommendation of supervision in the district of residence.  Do you have any objections to any of those conditions?

MS. WALSH:  I do not.

THE COURT:  Do you have any objection to my referring to these conditions as a group without reading them word for word into the record.

MS. WALSH:  I have no objection to that, your Honor.  My client has a copy of the PSR also, and we've reviewed it on more than one occasion.  So we waive any oral recitation of the

PCGJFRIS

special or the standard conditions.

THE COURT:  And your client was extradited here from another country.  I didn't see a reference to a judicial removal order, and I'm not sure that that's what one would file in this case.  But is it your contemplation that the supervised release period might be an academic exercise because your client would be deported immediately following the completion of his sentence, and to that end was there a judicial removal order that you'd like me to sign?  Or is it simply just the current contemplation that your client is not going to contest his removal at some later date?

MS. WALSH:  The latter.

THE COURT:  Okay, yes.

MS. WALSH:  I should also share with the Court that on behalf of my client I have consulted with immigration counsel, and so there's not a proposed judicial order.  But of course he will comply with the laws of immigration and this Court, especially a condition of supervised release may in fact be academic, but not necessarily in terms of what is available to my client during his period of incarceration.  So it's important to him.  I think it's important for his future.  But I expect that he will be deported and returned to his home country and will cooperate towards the end of his sentence.

THE COURT:  And I mean not to be obtuse, but I've had this happen in other cases.  Is it your contemplation that the

PCGJFRIS

imposition of a term of supervised release is something that is necessary or beneficial under the First Step Act?

MS. WALSH:  Yes, your Honor.

THE COURT:  Because of the calculation of credits?

MS. WALSH:  Yes.  And also to get ahead of myself, because of how earnest my client is in terms of participating in whatever is available to him.  He does not want to be disqualified from that either because of the First Step Act potential benefits he could receive, but also because of the quality of life that he will endure while incarcerated until his release will make a difference in terms of what programs are available to him is my understanding.

THE COURT:  Perhaps I should stop asking folks about judicial removal orders because I forgot about the way they interact or are somewhat countermanded by the First Step Act. Thank you for saying that, and I do intend to impose a term of supervised release.

Mr. Duarte Frias, let me speak to you.  You just heard me discussing your presentence investigation report with your attorney.  She advises me that you and she have reviewed the report; is that correct, sir?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  She also advises me that you don't have any objections to the contents of the report; is that correct, sir?

PCGJFRIS

THE DEFENDANT:  Yes, your Honor.

THE COURT:  She advises me that you and she have reviewed the mandatory, standard, and special conditions of supervised release, the latter of which were suggested for your case, and that you don't have any objections to those; is that correct, sir?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And she's indicated that you do not object to my summarizing these conditions or referring to them in a group rather than reading them word for word into the record; is that also correct, sir?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Thank you, Mr. Duarte Frias.  I am adopting the presentence investigation report, the factual statements contained in it, and the guidelines calculations contained in it.  And now let me please hear from the parties on the question of what is an appropriate sentence in this case.

Ms. Chong, please let me begin with you, and just to help me understand things.  The presentence investigation report refers to Mr. Duarte Frias participating in the money laundering aspect of this conspiracy for an extended period of time, but then I see the government's submission which suggests it might have just been a period of months.  I would like to understand to the extent that you know the length of Mr. Duarte

PCGJFRIS

Frias' participation in the money laundering and in the sale of fentanyl.  And to the extent that that is information that you've obtained in your investigation that illuminates the degree to which Mr. Duarte Frias knew he was doing this for the Sinaloa Cartel, knew he was doing this for the sons of El Chapo, knew about the violence that inhered in that particular organization, I would find that useful as well.  And then anything else you'd like me to know.  Thank you.

MS. CHONG:  Yes, your Honor.  I'm happy to start with your Honor's questions.  I think it's fair to say that the government's evidence establishes that the defendant engaged in money laundering for at least three months.  But largely, in light of the quantity of money at issue, which is almost a million dollars that he was entrusted with converting to cryptocurrency, we believe it is highly likely that he engaged in it for more than those three months.  But it is true that the evidence firmly establishes those three months of money laundering conduct.

As to the fentanyl sales that he was engaged in, based on the recorded calls that we have, we know that he was engaged in this particular sale to the undercover officer in 2023, and that conversations about that particular sale occurred over the course of months.  We do not have further transactions beyond the sale of the 10,000 pills and the one kilogram of fentanyl powder that occurred in early 2023.

PCGJFRIS

However, he did in a conversation that included his partner, Mario Alberto Jimenez Castro, discuss -- promise the undercover additional kilograms of fentanyl.  Based on the fact that he had that further conversation, we believe this was not a one-time transaction where he was not otherwise engaged in fentanyl sales.  Notably, the quantity suggests that he knew what he was doing and that he had the kind of trust and access required to sell large quantities of fentanyl.

As to offense conduct, your Honor --

THE COURT:  I'm just having a computer blip, so just excuse me for a moment.  Thank you.  Please keep going.  Thank you.

MS. CHONG:  Your Honor, given the conversations that he had on recorded calls that made clear he was involved not only in the money side of the business, but in the fentanyl side of the business, we think it is very clear that he did understand the Chapitos' business.  Underscoring that point, in one of the conversations, he and his partner offered to take payment for the fentanyl in the form of weapons, specifically AK-47s and AR-15s.  We think that's highly significant.  It indicates that he himself was interested in the tools of the trade and that he understood the usefulness of those tools, these firearms in that trade, which is of course the fentanyl trade.

THE COURT:  I'm going to ask for just one further

clarification.  In my lifetime involved in the criminal justice system, I have occasionally seen the undercover or the confidential source suggest the mode.  For example, I've seen situations in which the confidential source is the one who's making the preferences to the AK-47s, as distinguished from that being volunteered in the first instance from the target of those communications.  Is this a situation in which your confidential source suggested payment in assault weapons and Mr. Duarte Frias said, that's fine?  Or is this a situation in which it was Mr. Duarte Frias who said, look, you can pay me in money or assault rifles?

MS. CHONG:  Your Honor, I would have to go back to the recording, but I understand that it was more than a simple question from the undercover and an assent from the defendant and his partner.  It was a bit of conversation about receiving payment in the form of weapons.

THE COURT:  Please continue.  Thank you very much.

MS. CHONG:  As the Court knows from the government's written submission, the government is requesting a substantial sentence of 108 to 135 months in this case, and we believe that's very much warranted under Section 3553(a) factors.

We think here the most important Section 3553(a) factor is the very serious conduct that the government just described in some detail, specifically the defendant and his partner, Jimenez Castro, were money launderers who used

PCGJFRIS

cryptocurrency to assist the Sinaloa Cartel, and specifically the Chapitos in repatriating the drug proceeds to Mexico as part of the cartel's truly massive international fentanyl operation.

Now, our investigation gives us visibility into a slice of the defendant's money laundering activity, and that's that three-month span during which he and his partner laundered $869,000.  But we think that quantity over that time period is highly -- it's very notable, and it signifies how much trust the defendant had when it came to ensuring that the Chapitos received the proceeds of their activities.

The defendant did not of course confine his activities to money laundering, which shows that he understood the larger operation which involved fentanyl.  He demonstrated both his willingness and his ability to sell wholesale quantities when he sold that kilogram of powder and those 10,000 pills to the undercover.  And as I highlighted previously, he and his partner also offered to sell another ten kilograms of fentanyl, which is an extraordinary quantity of this very dangerous drug. Now --

THE COURT:  There was no sense on the part of the government or the investigators in this case that that ten-kilogram quantity was puffery, you know, that he was just sort of suggesting he had more access to more drugs than he did?  I've seen that happen too.  Doesn't mean it didn't happen

here.  And obviously your investigation may not have really shed light on this issue, but sometimes folks claim to have access to hundreds of kilograms and just don't.

MS. CHONG:  Your Honor, we think here he did have access in part because at that stage in the conversations there was no reason to puff.  It seemed clear that he wanted to make a profit, and he was interested in further engaging with a buyer who proved that he would in fact be able to buy, who would in fact be able to put up the money.  So we think here what the defendant was doing was making clear his interest in continuing a relationship that he and his partner had developed with the undercover.

I know the Court is well aware as to what a dangerous substance fentanyl is and the depths of a fentanyl crisis that now grips the United States, but I think I'd be remiss if I did not say a few words about this for the record.  As the government detailed in its submission, in 2023, which was the year of the defendant's fentanyl trafficking activity, that year marked the first time in U.S. history when the overdose death rate toped 112,000 deaths in a one-year period.  This is a crisis of almost unimaginable scale.

The defendant's personal participation in selling fentanyl combined with his willingness to accept payment in the form of weapons, and his money laundering for the Chapitos together reflect an extraordinary range of destructive conduct.

It underscores the defendant's understanding of the cartel's larger operations and his own personal willingness to endanger others for his own personal gain.

Now, as the government noted in its submission, of the 23 defendants charged in this indictment, all of whom are guilty of very serious conduct, the government acknowledges that this defendant is among the least culpable. And that's based on his relative role within the cartel and, most notably, the fact that to the government's knowledge the defendant was not involved in specific acts of violence. The government recognizes that and believes it is a significant distinguishing factor.

That said, the government believes that the defendant's lesser culpability is largely reflected in his stipulated guidelines range. And that is why the government is asking for the Court to stay within that range of 108 to 135 months. Now, I note that the government's position is consistent with probation's recommendation of 108 months. And probation formulated that recommendation after considering mitigating factors such as the defendant's lack of prior criminal history and his clean disciplinary record since entering Bureau of Prison's custody.

To reflect the nature and seriousness of the defendant's offenses, to promote respect for the law, to provide just punishment for the offenses, and to afford

adequate deterrence to criminal conduct, the government asks for a sentence under the stipulated guidelines range.  If the Court has no further questions, the government otherwise rests on its written submission.

THE COURT:  Do you have a sense of why Mr. Duarte Frias involved himself in the organization?

MS. CHONG:  Your Honor, from the defendant's submission and from the facts that the government has, my understanding is that he comes from Sinaloa Cartel territory. And we do recognize that many young men in that area see working with the Chapitos as a way to further themselves economically.  That is the government's understanding of what may have happened here.

THE COURT:  Thank you so much.

Ms. Walsh, I'll hear from you now.  I do have the same questions that I was asking of the prosecutor, which involve why your client did this and what he knew when he made these decisions.  Because we can agree this is not a situation where, for example, your client was a cryptocurrency trader — or perhaps he was, but what I'm saying is I understood his principal business to be the Mr. Wok restaurant that he and his family had, and I did not understand crypto to be his primary business.  But somehow he got involved in it and he also got involved in fentanyl, and neither one of those would seem obvious given the work he was doing.  So I would like to

PCGJFRIS

understand the pivot that he made.  Thank you.

MS. WALSH:  I'd like to contextualize my comments knowing not just where my client has come from, but who are most dear to him in this world remain where they remain, and that is his family and his friends and siblings.  So I'm mindful of what I don't understand and what I can't understand because I don't come from Sinaloa country and because I understand, as a lawyer in this courthouse and as an American citizen, how notorious that part of the world is for danger and for violence and for an utter disrespect for the rule of law.

So to proffer how it is that somebody by circumstance or happenstance is born in that part of the world not by choice, becomes involved in something like this, drug trafficking, when all of my interactions with Mr. Frias and, importantly, with his family suggests he comes from a God fearing, hard working, loving, and supportive family.

How it is that a young person who knows crypto and knows -- now apparently a lot more people understand how cryptocurrency works, but in 2022, in 2021, that wasn't necessarily the case, your Honor.  Now it's *de rigueur* and traded on the Nasdaq and traded in the highest levels of the government and elsewhere.  But back then, I think there were unsophisticated people in the drug trafficking industry, if you will, that didn't understand it, that manipulated and used young people with more technological propensity to assist in

nefarious endeavors.  I think that is where the genesis of this cryptocurrency portion of my client's culpability began, a university student, clearly smart, clearly engaged in math, science, and computers.  He knew how to do that.

I will point out that the Mr. Wok was a very short lived investment and a disappointment to the family.  It's closed, and it wasn't really a primary source of his income. He had hoped for it to become something.

THE COURT:  I would not have known that from the many submissions in this case.

MS. WALSH:  They were so proud of it.  They really did want it to be something and have hopes -- obviously high hopes of it becoming something one day.  I think the essence of that was to show to the Court that they are hard working people and did give that a try.

As far as knowing who is behind the drug trafficking and the drug transactions, I would submit from my standpoint if you're from Sinaloa, you know that that's the case.  Except for the fact that I too have some experience in the courthouse and in this district and I have seen government experts, Mr. Hernandez -- Alfred Hernandez is his name is a government expert that's testified for the government in multiple prosecutions that specifically testifies as to how people are insulated from the hierarchy in cartels and in the Sinaloa Cartel in particular.

THE COURT:  His name again, please.

MS. WALSH:  Hernandez.  It's Albert or Alfred.  He's a former NYPD detective.  And now he's a narcotics specialist.  He testified in a case before Judge Stein that I was involved in, and he's got a résumé as long as the day.  And that is a MO or *modus operandi* for organizations such as this to insulate people who are very high up.

My client has taken responsibility for this, your Honor.  And I don't want to antagonize at sentencing because he has taken such responsibility for his conduct, and rightfully so.  It is without question serious conduct.  It is without question a dangerous poison, this fentanyl substance.  And it is without question a significant departure or variance -- excuse me, variance that I am urging in this case.  I acknowledge that at the outset.

But this is a case that deserves that very attention and deserves a variance of that level for a number of reasons.  First, I think that the Court is correct in recognizing that when a young person in particular is involved in this kind of conduct, there is an element of puffery involved in everything they do, which is the hubris of youth and the arrogance of youth.

And most certainly, to the extent that it impacts this Court's decision today significantly, those tapes suggest that the gun transaction was introduced by the undercover.  This

PCGJFRIS

Court has hit the nail on the head with that, which has been a point of contention in this case and which my client has not pled to that count.  It's in a different language than my own. That tape is in Spanish and I have listened to it.  We have listened to it.  We've had interpreters listen to it again and again, and that question is introduced by law enforcement, perhaps, your Honor, for very legitimate law enforcement reasons.  I don't take that away from them.  That is their role.  That is their job, to ferret out dangerous bad guys.  I understand that.

But I think those tapes speak very clearly that it's not my client that's offering that and that there is an element of puffery going on there.  It's cross talk, it's over each other, it's laughing, it's men talking to each other.  There's some foul language involved.  It is puffery.

What is most significant about this young man is his propensity to do good.  And I have been involved with him since the fall of 2023.  It's a very long time to be with a client. And significantly, your Honor, his isolation from any other support at all, save one visit from his mother and sister together in all of that time, is really an extreme period of isolation for somebody in a foreign culture, a foreign country. Jail is not pleasant under any circumstances.  I understand that.  It's not supposed to be.  But to be that alone for that length of time from 26 to 28 is damaging in its isolation.

So I've spent significant time with this young man. And notwithstanding the lack of constructive things for him to do necessarily during the time that he's been in pretrial detention, he has continued to read in English, continued to read books in Spanish, he's continued to exercise diligently. He's continued to practice the English language so that he can proceed in English before this Court.

It is very significant to not even have a ticket for a milk carton in your cell. He doesn't even have that. That is no easy feat after 33 months of incarceration. But that's the type of person that he's capable of being and that I submit he will be once he finishes his time.

He owes a debt to this country and this society, no question about it. He owes it to his own, he's accepted responsibility for that. And I did point out in my submission that it's my understanding, as the government acknowledges, that among the 23 that are charged, he is at the lower end of culpability based on his relative low role and really importantly not involved in any violence. In fact, he fled violence in the MDC when it broke out on his floor and requested isolation in the SHU. That's extraordinary.

So your Honor, in recognizing that I'm making a very big ask for this young man and his family with such a significant variance, I want to point out that I -- of course I have a -- well, maybe not of course. Let me withdraw that.

PCGJFRIS

Indeed, I have a very different experience and belief in terms of the academics and the support for what deterrence means to a young man like this and why a significant sentence beyond the 60 months will not deter future criminal activity. I have been doing this too long to think otherwise.

But I do think the Court has tremendous power to reward acknowledgment of wrongdoing, self-perpetuated rehabilitation, excellent conduct while incarcerated under very difficult circumstances. I won't belabor the conditions of the MDC. And with that message, to tell people that have broken our laws, that our country also recognizes and our courts also recognize the deserving of mercy for those that acknowledge their guilt, those that attempt to make amends, and those that stay out of trouble from the second they are arrested and held in our custody. That should be acknowledged and rewarded. That message is heard far louder and farther than any message of general deterrence about narcotics trafficking. I've been doing this too long to know that that message is clearly not getting across, and we are warehousing far too many talented, remorseful young people at a great cost to our country and to society.

But the message of get on the straight and narrow and do the right thing, stay out of trouble and jail is a message of mercy and hope and justice that you don't just have to be the most powerful in the world to deserve the mercy of our

PCGJFRIS

courts.  And I ask the Court to consider that in sending a message to this young man, to his family, and to the people that he will eventually go home to.  Thank you very much for your attention.

THE COURT:  Thank you.  Let me just ask one question.  Earlier on in your presentation you noted -- one portion of your presentation began by acknowledging that Mr. Duarte Frias has accepted responsibility.  And you indicated that you did not wish to antagonize, and I wasn't sure where we were going with that.  I was interested in the constellation of circumstances that led your client to get involved in laundering money for the Sinaloa Cartel.  And it may be that that's just what happens in his neck of the woods if people are looking for employment, but if I'm allowed to know, I would like to know.

MS. WALSH:  Well, my understanding is that it was an old classmate that is the confidential source working with the government that had immigrated to this country and was reaching back through the internet to the hometown, and that's how my client became involved.  It's an old classmate from years ago that was tape recording him.

THE COURT:  No, no, but that's how he got involved with the fentanyl transaction, yes?

MS. WALSH:  Yes.

THE COURT:  But also the money laundering.  I would

have thought that would have come from a different section of the conspiracy.

(Counsel and defendant conferred)

MS. WALSH:  It's not, your Honor.  It is all from the same as far as my client's culpability is.

THE COURT:  All right.  Anything else you'd like me to know?

MS. WALSH:  No, thank you.

THE COURT:  Mr. Duarte Frias, at this time if you'd like to speak with me in connection with your sentence, you're invited to do so.  I know you've written something to me previously.  You're not obligated to speak, but you are invited to do so.  What I would ask, sir, is that if you wish to speak, and especially if you're reading from notes, if you could speak louder and slower than you think you need to so that everyone in the courtroom can hear you.  Is there something that you'd like to say at this time, sir?

(Counsel and defendant conferred)

THE DEFENDANT:  Yes, your Honor.  I prepared this for this day.  Good afternoon, your Honor.  Thank you for this opportunity to speak to you today.  For the past 33 months, I have been reflecting and regretting the things I did that brought me to prison.  I regret having lost my freedom and part of my life, but above all I regret the pain I have caused to my family, my ex-girlfriend, my friends, and the many people that

PCGJFRIS

care about me.  Not a day goes by that I don't pray and hope that my actions did not harm anyone.

However, I recognize my behavior was wrong and I ask forgiveness for my family, the people I let down, to this country for breaking the law, and to society for setting a bad example for younger people.  The consequences of my actions have taught me a lesson, and when released I will try to be an example to society hoping many will avoid the mistakes I made and learn from my experience.

My family has forgiven me and given me another opportunity to make things right and live a better life.  I hope that society will also forgive me and give me the opportunity to show that I am a new man who will value every day of his life.  Thank you.

THE COURT:  Sir, thank you very much.  Mr. Duarte Frias, what I need to do now is to take a brief break, and perhaps your attorney has let you know this.  If not, I'm telling you this now.  I don't come out on the bench with a sentence already in mind because I want to hear from everyone, and I now have heard from you.  You are the most important person I hear from, but I also listened to your attorney and the attorney for the government.

I'm going to take a break of about ten minutes and think about what you said and what everyone has said.  I'm going to come back as soon as I can, and I do ask for your

PCGJFRIS

patience.  And I commit to you I'm not trying to make this any more anxious or dramatic than it is.  I just need to have a clear head and clear mind when I'm making these decisions.  So I'll give you a heads up when I'm coming back, and I thank you for your patience.

(Recess)

THE COURT:  I'm going to -- Ms. Chong.  Excuse me.

MS. CHONG:  Your Honor, if I may just make a point of factual clarification in case it's helpful to the Court.

THE COURT:  Yes.  Thank you so much.

MS. CHONG:  At the end of the defense's presentation I think there was some suggestion that a government source may have been involved in getting the defendant to participate in the first instance and money laundering.

THE COURT:  Yes, I have a note.  Old classmate is confidential source.  That's how he got involved in fentanyl and money laundering.

MS. CHONG:  And I wanted to clarify that the government's understanding of the events is as set out in its summation of the offense conduct in its submission.  The government's view is that the defendant was introduced by someone in his own past to the co-conspirator who he worked with here, Mr. Jimenez Castro.  So he was involved in money laundering prior to the government's involvement in this case.

THE COURT:  Please excuse me.  "He" of whom you speak

PCGJFRIS

is Mr. Duarte Frias or Mr. Jimenez Castro?

MS. CHONG:  I apologize.  The defendant of his own accord became involved with his co-defendant, Mr. Jimenez Castro without government involvement.

THE COURT:  And then later on came the confidential source?

MS. CHONG:  And later on came a confidential source whom the defendant directed to do money pickups.

THE COURT:  All right.  Thank you so much.

Ms. Walsh, you want to be heard on that, you may.  If not, it will just be a dispute between the parties.

MS. WALSH:  Thank you, your Honor.

THE COURT:  Thank you.  And again, Ms. Chong, thank you for the clarification.

I am going to describe the sentence that I intend to impose.  I will give each side an opportunity to make legal objections before the sentence is actually imposed.  But when I sentence someone, I am required to consider factors set forth by congress, several of which has been discussed by the parties today.  And these factors include the nature and circumstances of the offense, the history and characteristics of Mr. Duarte Frias, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide a just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from

further crimes by Mr. Duarte Frias, to provide him with needed education, vocational training, medical care, or other correctional treatment in the most effective manner.  I must consider the sentencing guidelines and any applicable policy statements.  I must consider the need to avoid unwarranted sentence disparities among similarly situated defendants.

My guidelines calculations replicate those in the PSR, in the presentence investigation report, and therefore they differ somewhat from those set forth in the parties' plea agreement.  The base offense level here is 34 based on guidelines sections 2S1.1 and 2D1.1, and there is a two-level enhancement because there is a money laundering offense under Section 1956.  There is, as well, a three-level reduction for acceptance of responsibility, yielding an adjusted offense level of 33.  Mr. Duarte Frias has no criminal history points and is Criminal History Category I, and his resulting guidelines range is 135 to 168 months' imprisonment.  There is a mandatory minimum term of 60 months' imprisonment.  That is what the defense seeks.  Government seeks a sentence within the range set forth in the plea agreement.

I do want to thank the parties for their written and oral submissions to me.  And Mr. Duarte Frias, let me note that there are so many people who come before me in cases of this type who are the -- I won't say their conduct is excused, but it is understood.  They often come from broken homes.  They

PCGJFRIS

often have untreated mental health issues.  And it is somewhat gratifying to hear about your family, but also to read from them, read their submissions, because they are obviously so caring and so supportive of you.  I'm certainly not going to penalize you for having a stable family.

It does, however make your conduct somewhat more puzzling to me because I did not get the sense that you were forced into this conduct because of the absence of any other alternatives or somehow that you were abandoned by your family.  I also want to note that what you did was especially bad.  To my mind it would have been enough for you to be laundering nearly a million dollars in drug proceeds in cryptocurrency transactions on behalf of one of the most notorious drug trafficking organizations in the world.  And it also would have been enough for you to personally traffic in kilogram quantities of fentanyl.  But you did both of those things, and it appears as well that you at least discussed the possibility of trading drugs for assault weapons.

There's nothing to suggest that your actions were a one-time occurrence.  They appear to have taken place over a period of months.  And all of those things are things that I've thought about.  But I've also thought about mitigating factors that you and your attorney have identified, and they've included your lack of criminal history, the fact that you have such a clean record during your detention, the rehabilitation

PCGJFRIS

that you've undertaken while you've been detained, the conditions of confinement, the separation that you have had from your family and support system.  And even the government has acknowledged that you are at the low end of this particular conspiracy.

Your attorney noted very ably that you have the potential to do so much more, and it's not my place to extinguish that hope, but to balance it with the conduct in which you've engaged.  And so having considered all of the factors on both the aggravating and the mitigating circumstances here, I'm going to impose concurrent terms of 80 months' imprisonment.  I'm varying downwards to 80 months' imprisonment, and I'm ordering that the term of imprisonment be followed by a concurrent term of four years of supervised release on Count Two and three years of supervised release on Count Six.  They run together, so it's four years in total.  I am not ordering a fine.  I'm not ordering restitution.  I have ordered $869,000 in forfeiture, and I'm obligated to impose a mandatory assessment of $200.

Ms. Chong, is there any legal reason why I may not impose this sentence?

MS. CHONG:  No, your Honor.

THE COURT:  And Ms. Walsh, is there any legal reason why I may not impose this sentence?

MS. WALSH:  No, your Honor.

PCGJFRIS

THE COURT:  Mr. Duarte Frias, I'm going to ask you to stand, sir.  Thank you.

Sir, I've considered all of the factors that are set forth in Section 3553(a) of Title 18 of the United States Code. I've considered the guidelines as they apply to this case and the oral and written presentations of you, your attorney, and the attorneys for the government.  And I find that concurrent terms of 80 months' imprisonment are sufficient, but no greater than necessary, to comply with all of the purposes of sentencing.  I'm ordering that that term be followed by an aggregate term of four years of supervised release with four years on Count Two and three years on Count Six.

And I'm imposing the mandatory, standard, and special conditions that we talked about earlier.  Let me just speak about those momentarily.  With respect to the condition of compliance with immigration authorities, that's because of the fact that you were extradited here and that you are not a citizen or a lawful permanent resident of this country. There's a search condition, and that's because of the nature of the offenses to which you've pleaded guilty.  And there is a recommendation of supervision in your district of residence. If it turns out that you're placed on supervised release, that is easier for you and for the respective probation offices. And so I am imposing those conditions.  I am, as well, not ordering a fine or restitution, ordering forfeiture in the

PCGJFRIS

amount of $869,000, and imposing a mandatory special assessment of $200.

Sir, do you understand that that is your sentence?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  All right.  Mr. Duarte Frias, please be seated, sir.  Mr. Duarte Frias, except to the extent you may have waived this in any agreement that you may have with the government, you have the right to appeal from your conviction and from your sentence.  If appeal is something in which you're interested, please speak with your attorney because she's familiar with the process by which an appeal is taken.

I don't give legal advice, sir, but I'll note that generally speaking, you have two weeks from the date the judgment is entered, the written judgment is entered, to file a notice of appeal.  And my expectation is that the judgment would be entered sometime in the next couple of days.  So if appeal is something in which you're interested, please speak with your attorney.  Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Thank you.  Ms. Walsh, are you recommending a place of designation or asking me to recommend participation in the RDAP program?

MS. WALSH:  Yes, your Honor.  California on the west coast, if the Court would be inclined to make a recommendation, closer to where his family is than the East Coast.  And I've

PCGJFRIS

also agreed to ask the Court to make a recommendation that my client be eligible for the First Step Act, what's available to him, as well as credit for the time that he has done in pretrial custody under the First Step Act.  So I'm asking for that recommendation at my client's request.

THE COURT:  All right.  Thank you.  I will see what they will do.  Once again, no to the RDAP then.

MS. WALSH:  No, we would request that recommendation please.

THE COURT:  Thank you.  I did not hear so.  So I will order that as well.  And California, as you know, is a rather large state.  Are you asking for facilities in Southern California?

MS. WALSH:  Yes, please, southern.  Thank you.

THE COURT:  To be closer to -- all right.  Thank you.

Ms. Chong, I believe that there are additional charges.  Are you asking for those to be dismissed?

MS. CHONG:  Yes, your Honor.  The government moves to dismiss the open counts.

THE COURT:  That motion is granted.  And Ms. Chong, from your perspective, is there anything that I failed to do this afternoon?

MS. CHONG:  No, your Honor.  Thank you.

THE COURT:  Thank you so much for your time. Ms. Walsh, thank you as well.  From your perspective, and your

PCGJFRIS

client's perspective, is there anything that I failed to do this afternoon?

MS. WALSH:  No.  Thank you, your Honor, very much. Thank you.

THE COURT:  Thank you very much.  And may I address your client one last time?

MS. WALSH:  Yes, please.  Of course.  Yes.  Thank you, your Honor.

THE COURT:  Mr. Duarte Frias, I have every reason, sir, to expect that this is the last time you and I will be seeing each other.  And so I do want you to know that it really did -- the statements of your family members really impressed me.  They were individualized, they were not repeating each other.  They all brought different perspectives.  And it's very obvious how much they care for the other members of your family and how much they care for you.

I am confident they will continue to support you through this.  And my hope is you return to them as quickly as you can and that you not reoffend again, that you just rejoin law abiding society with their support.  So it is my expectation that you and I not see each other again, and I will therefore just wish you well today.  Thank you all.

THE DEFENDANT:  Thank you very much, your Honor.

THE COURT:  Absolutely.  Thank you.  We're adjourned.

(Adjourned)