UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

        - v. -

RUBEN ROCHA MOYA,
ENRIQUE INZUNZA CAZAREZ,
ENRIQUE DIAZ VEGA,
DAMASO CASTRO ZAAVEDRA,
MARCO ANTONIO ALMANZA AVILES,
ALBERTO JORGE CONTRERAS NUNEZ,
    a/k/a "Cholo,"
GERARDO MERIDA SANCHEZ,
JOSE ANTONIO DIONISIO HIPOLITO,
    a/k/a "Tornado,"
JUAN DE DIOS GAMEZ MENDIVIL, and
JUAN VALENZUELA MILLAN,
    a/k/a "Juanito,"

          Defendants.

**SEALED SUPERSEDING INDICTMENT**

S9 23 Cr. 180 (KPF)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Narcotics Importation Conspiracy)

The Grand Jury charges:

### Overview

1.     The Sinaloa Cartel (the "Cartel") is one of the most violent criminal organizations in the world and has transformed the Mexican State of Sinaloa into the geographic epicenter of the global narcotics trade. From its home base in Sinaloa, the Cartel has worked with criminal elements around the world—cocaine producers and distributors in Colombia and Venezuela, drug traffickers and corrupt politicians throughout Central and South America, and precursor chemical manufacturers in China and elsewhere—to distribute massive quantities of narcotics into the United States and inflict unimaginable damage on communities throughout this

country. The Cartel has also carried out rampant violence, including thousands of murders, throughout Mexico and elsewhere around the world, including in the United States.

2.      To protect and grow this drug trafficking empire, the Cartel has partnered with corrupt politicians and law enforcement officials, including the current Governor of Sinaloa, RUBEN ROCHA MOYA, the defendant. These politicians and law enforcement officials have abused their authority in support of the Cartel, exposed and subjected victims to threats and violence, and sold out their offices in exchange for massive bribes. Indeed, certain police officials in Mexico, including certain of the defendants, have directly participated in the Cartel's violence and retribution, including by murdering enemies of the Cartel and kidnapping individuals in Mexico suspected of cooperating with U.S. law enforcement.

3.      RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, all of whom are current or former government or law enforcement officials in Sinaloa, have participated in this conspiracy with the Cartel to import massive amounts of fentanyl, heroin, cocaine, and methamphetamine from Mexico into the United States. Among other things, the defendants have shielded Cartel leaders from investigation, arrest, and prosecution; caused sensitive law enforcement and military information to be provided to members of the Cartel and allied drug traffickers to assist the Cartel's criminal activities; directed members of state and local law enforcement agencies, such as the Sinaloa State Police, the Investigative Police for the Sinaloa State Attorney General's Office, and the Culiacan Municipal Police, to protect drug loads stored

2

in and transiting through Mexico to the United States; and allowed brutal drug-related violence to be committed by members of the Cartel without consequence. In exchange, the defendants have collectively received millions of dollars in drug money from the Cartel.

4.    While certain of the defendants have worked with a variety of narco-traffickers, the defendants generally have been most closely aligned with one faction of the Cartel, referred to herein as the "Chapitos." Ivan Archivaldo Guzman Salazar ("Ivan"), Jesus Alfredo Guzman Salazar, a/k/a "Alfredo" ("Alfredo"), and Ovidio Guzman Lopez, a/k/a "Raton" ("Ovidio"), collectively referred to herein as the "Chapitos Leaders," are sons of the Cartel's notorious former leader, Joaquin Archivaldo Guzman Loera, a/k/a "El Chapo," and have, as further detailed below, led the Chapitos faction of the Cartel since their father was extradited to the United States in or about January 2017. They have, alongside the defendants, perpetuated a narcotics-fueled cycle of corruption, whereby they provide the defendants and other politicians and law enforcement officials with bribes in exchange for their protection and support.

**The Defendants**

5.    RUBEN ROCHA MOYA, the defendant, is the current Governor of Sinaloa, a position that he has held since on or about November 1, 2021. As Governor of Sinaloa, ROCHA MOYA is the chief executive of the state, and oversees all aspects of the state's administration. Among other things, ROCHA MOYA is responsible for Sinaloa's internal security, which includes overseeing state and local police forces and working with Mexican federal law enforcement agencies. ROCHA MOYA, a longtime politician, was elected as Governor of Sinaloa in or about June 2021, with the support of the Chapitos. To support ROCHA MOYA's election, the Chapitos Leaders, among other things, ordered Chapitos members to steal ballots with votes for ROCHA MOYA's opponents, and kidnap and intimidate opposition candidates. In exchange,

3

and as described further below, on multiple occasions prior to and after becoming Governor of Sinaloa, ROCHA MOYA attended meetings with the Chapitos Leaders and other Cartel leaders at which ROCHA MOYA pledged to support the Cartel's drug trafficking operations. Those meetings were guarded by Cartel enforcers, known as *sicarios*, who were armed with machineguns and other weapons. As he had promised, since he was elected Governor, and in exchange for the Chapitos' support in his election, ROCHA MOYA has allowed the Chapitos to operate with impunity in Sinaloa. Among other things, ROCHA MOYA has allowed the Chapitos Leaders to install other corrupt officials in positions of power within the state and local governments of Sinaloa, and in certain state and local law enforcement agencies. In turn, the Chapitos-aligned officials in ROCHA MOYA's administration have protected the Chapitos and its drug trafficking operations.

6.     ENRIQUE INZUNZA CAZAREZ, the defendant, is a current Senator in Mexico representing Sinaloa, a position that he has held since in or about August 2024. Prior to becoming a Senator, INZUNZA CAZAREZ was the Secretary General for Sinaloa, an appointed cabinet-level position, under RUBEN ROCHA MOYA, the defendant. Like ROCHA MOYA, INZUNZA CAZAREZ has met with the Chapitos Leaders and other leaders of the Cartel and agreed on specific plans for the government in Sinaloa, under ROCHA MOYA, to support and protect the Cartel in exchange for favors from the Cartel that, in turn, help the defendants and other corrupt officials remain in power.

7.     ENRIQUE DIAZ VEGA, the defendant, is a businessman from Sinaloa who served as the Secretary of Administration and Finance for the Government of Sinaloa, an appointed cabinet-level position, under RUBEN ROCHA MOYA, the defendant, from in or about November 2021 to in or about September 2024. As high-level cabinet members, both DIAZ VEGA and

4

ENRIQUE INZUNZA CAZAREZ, the defendant, helped the Chapitos Leaders install corrupt officials to protect the Chapitos' drug trafficking operations and served as liaisons between the Chapitos Leaders and ROCHA MOYA, including by conveying communications from the Chapitos Leaders to ROCHA MOYA regarding the Chapitos' support of ROCHA MOYA in exchange for his administration's protection of the Chapitos. In addition, among other things, in advance of the June 2021 gubernatorial election in Sinaloa, in which ROCHA MOYA was elected Governor, DIAZ VEGA delivered to the Chapitos Leaders the names and addresses of ROCHA MOYA's opponents, so that the Chapitos could threaten and force those opponents to drop out of the gubernatorial race.

8.     DAMASO CASTRO ZAAVEDRA, the defendant, is the Deputy Attorney General for the Sinaloa State Attorney General's Office, a position he has held since in or about October 2021. ZAAVEDRA has served as a public prosecutor in Mexico in different capacities since at least in or about 1998. As the Deputy Attorney General for Sinaloa, ZAAVEDRA has received monthly bribes from the Chapitos. In exchange, ZAAVEDRA has protected Chapitos members from being arrested and informed the Chapitos of planned U.S.-backed law enforcement operations, including information about law enforcement operations targeting the Chapitos' drug labs and members, so that the Chapitos could destroy or move evidence of drug trafficking activities in advance of those operations.

9.     MARCO ANTONIO ALMANZA AVILES, the defendant, was the head of the Investigative Police for the Sinaloa State Attorney General's Office—one of the police forces responsible for investigating crimes in Sinaloa and also known as the Ministerial Police—from in or about 2017 to in or about November 2022. In that role, AVILES received bribes from the Chapitos, and, in exchange, allowed the Chapitos to operate freely within Sinaloa, including with

respect to its drug trafficking activities. Among other things, AVILES issued arrest warrants for the Chapitos' enemies when requested by the Chapitos and allowed shipments of chemicals used to produce the Chapitos' fentanyl to be transported through Sinaloa.

10. ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," the defendant, succeeded MARCO ANTONIO ALMANZA AVILES, the defendant, as the head of the Investigative Police for the Sinaloa State Attorney General's Office in or about November 2022, a position CONTRERAS NUNEZ held until in or about February 2026. In that role, CONTRERAS NUNEZ received bribes from the Chapitos and, in exchange, allowed that faction to operate freely within Sinaloa, including with respect to its drug trafficking activities. Among other things, CONTRERAS NUNEZ ordered the release of Chapitos members who had been arrested for their drug trafficking activities.

11. GERARDO MERIDA SANCHEZ, the defendant, was the Secretary of Public Security for Sinaloa, an appointed cabinet-level position, under RUBEN ROCHA MOYA, the defendant, from in or about September 2023 until his resignation in or about December 2024. In that role, SANCHEZ was responsible for overseeing the Sinaloa State Police and appointing the Director of the Sinaloa State Police. As the Secretary of Public Security for Sinaloa, SANCHEZ received bribes from the Chapitos and, in exchange, provided the Chapitos with, among other things, advance notice of law enforcement raids on drug labs, so that the Chapitos could move their drugs and lab equipment before the raids.

12. JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," the defendant, was the Deputy Director of the Sinaloa State Police from in or about 2017 to in or about 2022. Both before (from in or about 2012 to in or about 2016) and after (from in or about 2022 to in or about July 2024) his time in that role, HIPOLITO was a commander in the Sinaloa State Police.

In those roles, HIPOLITO received monthly bribes from the Chapitos. In exchange, HIPOLITO allowed the Chapitos to operate without interference in his jurisdiction, installed other police officers who were on the Chapitos' payroll and/or who otherwise supported the Chapitos in positions of power within the Sinaloa State Police, and was involved in giving the Chapitos advance notice of law enforcement operations against the Chapitos so that members of the Chapitos could evade arrest and detection and otherwise take steps to protect themselves in advance of those operations.

13.    JUAN DE DIOS GAMEZ MENDIVIL, the defendant, is the Mayor of Culiacan, the capital of and largest city in Sinaloa. MENDIVIL has been Mayor of Culiacan since in or about June 2022. As mayor, MENDIVIL has received bribes from the Chapitos. In exchange, MENDIVIL—who has authority over the Culiacan Municipal Police as Mayor—has allowed the Chapitos to operate in Culiacan without government interference, protected the Chapitos' drug trafficking operations in his jurisdiction, and protected members of the Chapitos from arrest.

14.    JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendant, was a high-level commander in the Culiacan Municipal Police, serving in that role from in or about 2018 to in or about 2024. In that role, MILLAN received monthly bribes from the Chapitos for himself, his commanders, and over 40 other municipal police officers. In exchange, MILLAN gave the Chapitos unlimited access to the Culiacan Municipal Police and used that police force's officers and resources to help the Chapitos traffic drugs and maintain its stronghold over Culiacan, including by arresting, kidnapping, and/or killing enemies of the Chapitos. For example, in or about October 2023, MILLAN helped the Chapitos kidnap a confidential source (the "CS"), Alexander Meza Leon, who had been working with the U.S. Drug Enforcement Administration (the "DEA"), and the CS's relatives, some of whom the Chapitos then tortured and killed, because

they suspected that the CS had been providing information to the DEA in connection with this investigation.

### The Sinaloa Cartel

15.    The Cartel is one of the most prolific and violent drug trafficking organizations in the world. For decades, the Cartel has been largely responsible for the influx of heroin, cocaine, and methamphetamine into the United States and, more recently, in the last approximately eight years, for the massive increase in fentanyl distribution into the United States, as well as the accompanying violence and deaths that have afflicted communities on both sides of the U.S.-Mexico border.

16.    The Cartel was formed by El Chapo, among others, in the 1990s. By in or about 2008, El Chapo emerged as the most powerful leader of the Cartel, operating his own faction alongside factions led by Ismael Zambada Garcia, a/k/a "El Mayo," and Juan Jose Esparragoza Moreno, a/k/a "El Azul." Following El Azul's reported death in or about 2014, and El Chapo's arrests in Mexico in or about 2014 and 2016, and subsequent extradition to the United States, El Chapo's sons—Ivan, Alfredo, and Ovidio—succeeded their father as leaders of the Cartel alongside El Mayo. Eventually, the Cartel splintered into factions, and, ultimately, the Chapitos emerged as the largest and most powerful of these factions, largely due to the relentless campaign of extensive bloodshed by Cartel *sicarios* loyal to the Chapitos.

17.    In the last several years, certain leaders of the Cartel, including one of the Chapitos Leaders, have been arrested, and certain of those arrested have been extradited to the United States to stand trial. More specifically, in or about January 2023, Ovidio was arrested in Mexico, and in or about September 2023, he was extradited to the United States. In or about July 2024, El Mayo was brought to the United States. As a result, the Cartel is now divided into two

8

main rival factions: the Chapitos faction led by the two Chapitos brothers who were previously charged in this case but remain at large in Mexico—co-defendants Ivan and Alfredo—and another faction led by El Mayo's son, Ismael Zambada Sicairos, a/k/a "El Mayito Flaco." In part owing to the war that has been raging between these two factions since El Mayo's arrest and the loyalty to the Cartel by corrupt government and law enforcement officials, including the defendants, Sinaloa and other areas in Mexico have been subjected to ever-increasing violence in recent years.

### Means and Methods of the Cartel's Drug Trafficking Conspiracy

18.    For years, the Cartel has reaped billions of dollars in profits from its fentanyl, heroin, cocaine, and methamphetamine trafficking. The Cartel's home base in Sinaloa provides it with a strategic advantage for narcotics suppliers. Sinaloa is readily accessible by land, air, and maritime routes from Central and South America, allowing producers and distributors of cocaine to ship their product to Sinaloa and the surrounding areas under the Cartel's control. More recently, Sinaloa's location on the Pacific coast of Mexico has provided both maritime and air access for Chinese providers of precursor chemicals necessary to produce fentanyl and methamphetamine to Sinaloa and the surrounding states. In addition, from its base in Sinaloa, the Cartel also has controlled the Mexican states of Sonora (to the direct north of Sinaloa) and Baja California (to the direct west of Sinaloa), which have developed into the primary entry points for U.S.-bound narcotics. Through those entry points into the United States and other means of transportation across the U.S./Mexico border, the Cartel has funneled fentanyl, heroin, cocaine, and methamphetamine into this country.

19.    Fentanyl is a dangerous synthetic opioid that is over 50 times more potent than heroin. Just two milligrams of fentanyl, a tiny amount that could fit on the tip of a pencil, is a potentially deadly dose for a human being. Over the last decade, fentanyl has been one of the

9

leading causes of death for Americans ages 18 to 49, and it has fueled the opioid epidemic that has been ravaging families and communities across the United States. Fentanyl has also fueled violence and destruction across Mexico. As of at least in or about 2019, relying on precursors shipped from China and elsewhere, Mexico-based cartels had overtaken China as the manufacturing source of most of the fentanyl trafficked to the United States. Now, as a result, most of the fentanyl that reaches the United States comes from Mexico-based drug traffickers, led by the Cartel.

20.    The Cartel also continues to traffic heroin and has cultivated opium poppy (for the production of heroin), as it has done for generations. Indeed, Mexico is the main source country for the heroin sold in the United States, and the Cartel is responsible for supplying the vast majority of heroin sold to U.S. markets. Today, heroin is frequently mixed with fentanyl, which results in the most dangerous and deadly aspect of the U.S. heroin market.

21.    Mexico's drug trafficking organizations, including the Cartel, are also among the leading producers of methamphetamine in the world. For decades, the Cartel has exerted a hold over the global supply of methamphetamine and has capitalized on the cheap production and maintenance costs of manufacturing this heavily-addictive narcotic for massive profit.

22.    Finally, the Cartel also traffics cocaine from Mexico into the United States. The Cartel has longstanding ties to cocaine producers in South America and continues to be one of the main suppliers of cocaine to U.S. markets. Cocaine trafficking and abuse have been persistent threats in the United States for over 40 years. The Cartel largely controls the cocaine trafficking corridors from South America through various countries in Central America, including

10

Honduras and Guatemala, into Mexico and then from Mexico into the United States, smuggling multi-ton shipments of powder cocaine and cocaine base from South American traffickers.

23.    The methods through which Cartel traffickers import and smuggle huge amounts of fentanyl, heroin, cocaine, and methamphetamine across the border into the United States are diverse, including by boats, private planes, and ATVs. Certain of these shipments are smuggled on board vessels that themselves are legally declared and lawfully access ports of entry. Most often, the Cartel's narcotics cross U.S. borders at ports of entry, for example, concealed in secret compartments of cars, disguised among commercial goods in tractor-trailers, hidden in luggage on planes, obscured through fake paperwork in shipping containers, or secreted on or in the bodies of drug mules. The Cartel relies on the impossibility of inspecting every item that crosses the U.S.-Mexico border. Other of these shipments are transported on board so-called "black flights"—that is, flights where airplanes turn off their transponders to fly undetected—or undeclared maritime vessels that travel from Mexico and unlawfully enter the United States carrying illicit products. The Cartel also imports its fentanyl, heroin, cocaine, and methamphetamine into the United States through secret tunnels that connect Mexico to the United States.

24.    Once the Cartel has transported its narcotics into the United States, Cartel traffickers maintain designated stash locations where the fentanyl, heroin, cocaine, and/or methamphetamine are stored, which are generally clustered in U.S. metropolitan areas along the border in, for example, Southern California; El Paso, Texas; and Phoenix, Arizona. The Cartel's U.S.-based distribution network then sells these narcotics wholesale for retail distribution throughout the United States, including in New York City and other destinations along the East Coast.

11

25.     For example, in furtherance of the drug-trafficking conspiracy, the Cartel carried out the following drug shipments, among thousands of others:

a.      In or about May 2022, approximately 189,000 fentanyl pills, two kilograms of fentanyl powder, half a kilogram of cocaine, and 15 pounds of methamphetamine were seized by U.S. law enforcement in Phoenix, Arizona. Those narcotics belonged to the Cartel, which was attempting to import them from Mexico into the United States for redistribution.

b.      In or about July 2022, approximately 5,000 kilograms of methamphetamine were seized by U.S. law enforcement in Southern California near the Mexico-U.S. border. Those narcotics belonged to the Cartel, which was attempting to import them from Mexico into the United States for distribution.

c.      On or about August 19, 2022, approximately 41.2 kilograms of fentanyl powder, 630,000 fentanyl pills, more than five kilograms of heroin, and more than five kilograms of cocaine, as well as approximately $22,000 in cash, were seized from a single stash house in Phoenix, as displayed in the photograph below. The fentanyl pills, kilograms of fentanyl, heroin, and cocaine belonged to the Cartel and included packages of drugs with stamps of the Chapitos' signature symbols: the words "Chapiza" and "Raton," which are a common name for the Chapitos Leaders and the well-known alias for Ovidio, respectively.

12



d.      In or about February 2023, approximately 53 pounds of fentanyl powder and 2,200 pounds of methamphetamine were seized by U.S. law enforcement in Southern California near the Mexico-U.S. border. Those narcotics belonged to the Cartel, which was attempting to import them from Mexico into the United States for distribution.

e.      On or about September 12, and September 15, 2023, more than 600 pounds of liquid methamphetamine and 400 pounds of cocaine, respectively, worth an estimated total value of approximately $5,367,525 in U.S. dollars, were seized by U.S. law enforcement in Southern California near the Mexico-U.S. border. Those narcotics belonged to the Cartel, which was attempting to import them from Mexico into the United States for distribution.

f.      In or about December 2023, more than 3,000 pounds of methamphetamine and 500 pounds of cocaine, worth an estimated total value of approximately $10,430,000 in U.S. dollars, were seized by U.S. law enforcement in Southern California near the Mexico-U.S. border. Those narcotics belonged to the Cartel, which was attempting to import them from Mexico into the United States for distribution.

g.      On or about January 28, 2025, approximately 10,000 fentanyl pills and additional fentanyl powder were seized by U.S. law enforcement in Southern California near

13

the Mexico-U.S. border. Those narcotics belonged to the Cartel, which was attempting to import them from Mexico into the United States for distribution.

## Corrupt Public Officials and Armed *Sicarios* Protect the Cartel's Drug Trafficking Operations

26.     To protect and further its drug trafficking operations and to ensure loyalty to the Cartel and its protection, the Cartel relies on and directs not only hundreds of violent, heavily armed *sicarios*, but also scores of corrupt government officials who regularly receive bribes from the Cartel. The security apparatus formed by the *sicarios*, coupled with the Cartel's relationships with corrupt government officials, protect the Cartel's operations and its leaders, territory, labs, trafficking routes, and money.

27.     First, the Cartel's *sicarios* regularly use military-grade weapons, including armored trucks, bazookas (rocket launchers), grenades and hand-held grenade launchers, and various types of firearms, ranging from .45 and .38 caliber handguns to AK-47s, AR-15s, and other machineguns, to perpetrate violence, including murder, torture, and kidnapping. The Cartel uses this powerful security apparatus to destroy unsupportive businesses, capture contested territory, intimidate civilians, and attack unfriendly members of law enforcement. Indeed, Cartel *sicarios* have shot and killed Mexican government officials who, unlike the defendants, refused to protect the Cartel. This relentless violence has led to rampant bloodshed and taken hundreds of lives in Mexico and the United States. As a result, the Cartel has achieved near total control over all drug trafficking activity in many parts of Mexico, including the manufacturing and importation of fentanyl, heroin, cocaine, and methamphetamine from those parts of Mexico into the United States.

28.     Second, rampant corruption is essential to the Cartel's operations. The largest drug traffickers in the world rely on corrupt public officials to maintain and grow their drug distribution networks. This corruption has infected countries throughout South and Central

14

America, including Colombia, Venezuela, Honduras, and Guatemala, where certain politicians at the highest levels have received veritable fortunes from narco-traffickers who cause pain and destruction in their countries and communities. In Sinaloa, and other parts of Mexico, this same corruption permeates all levels of local, state, and federal government, and allows the Cartel and its drug trafficking operations to function and thrive. For more than a decade, the Cartel, under the rule of the Chapitos Leaders, and, before them, El Chapo and El Mayo, has paid cash bribes to public officials at each level of the government, in exchange for protection of the Cartel's drug trafficking operations. These corrupt government and law enforcement officials, including the defendants, are essential to the Cartel's drug trafficking operations.

29. With respect to the Chapitos, different members are responsible for paying those bribes. For example, a member of the Chapitos—known as the "plaza boss" of Culiacan—is responsible for overseeing the Chapitos' drug trafficking operations in Culiacan and in parts of the greater Sinaloa area, including by managing the Chapitos' relationships with the corrupt municipal, ministerial, and state level law enforcement officials in those areas. The plaza boss of Culiacan typically receives from the Chapitos Leaders, on a monthly basis, a box with a large amount of cash, which is accompanied by a list of corrupt government officials, and the amount each official is to be paid in bribes that month. Certain of the defendants were regularly on this list because they received regular, monthly bribes from the Chapitos. For example, below are photographs of some of the monthly lists provided to the plaza boss of Culiacan, which include certain Sinaloa-based corrupt law enforcement officials who received regular, monthly bribes from the Chapitos. The lists were recovered from Mexico in connection with this investigation. The names on the lists circled in red below refer to the official government positions held by DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, and ALBERTO JORGE

15

CONTRERAS NUNEZ, a/k/a "Cholo," and refer directly by name to JOSE ANTONIO DIONISIO

HIPOLITO, a/k/a "Tornado," and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the

defendants, respectively:





16



Specifically, the lists above demonstrate that: ZAAVEDRA—referred to as "Culiacan Regio" on the list—received a bribe of approximately $200,000 pesos (approximately $10,893 U.S. dollars) each month from the Chapitos; ALMANZA AVILES and then his successor, CONTRERAS NUNEZ, in their role as the head of the Investigative Police for the Sinaloa State Attorney General's Office—referred to as "R1" on the list—received a bribe of approximately $300,000 pesos (approximately $16,670 U.S. dollars) each month from the Chapitos; HIPOLITO—referred to as "Tornado" on the list—received a bribe of approximately $100,000 pesos (approximately $5,450 U.S. dollars) each month from the Chapitos; and MILLAN—referred to as "Juanito" on the list—received a bribe of approximately $30,000 pesos (approximately $1,667 U.S. dollars) each month from the Chapitos.

30.     In exchange for these regular bribes, the defendants and other corrupt officials have allowed the Chapitos to traffic tons of narcotics and carry out mass violence with impunity. As just a few examples: First, the law enforcement officials on the Chapitos' payroll have been told not to arrest members of that faction of the Cartel, and, instead, have been instructed, including by DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, to arrest the Chapitos' rivals. Second, corrupt law enforcement officials in charge of the State Sinaloa Police and the Culiacan Municipal Police, including HIPOLITO and MILLAN, respectively, have allowed members of the Chapitos to sell the Cartel's drugs openly on the street and to carry firearms without interference. Third, in order to facilitate the safe passage through Mexico of huge loads of drugs, including fentanyl, heroin, cocaine, and methamphetamine, corrupt law enforcement officials in Sinaloa, including ZAAVEDRA, AVILES, SANCHEZ, and HIPOLITO, have given the Chapitos—often through the plaza boss of Culiacan—access to information about ongoing investigations and planned searches and seizures by the Mexican army or navy of drug labs and safehouses where the Chapitos store drugs, weapons, and money, allowing the Chapitos to move its operations and evidence of criminal activity before those searches occur. And, finally, certain corrupt officials, including MILLAN, as discussed in greater detail below, have helped the Chapitos kidnap and murder its enemies, including individuals suspected of cooperating with the U.S. Government against members of the Chapitos.

### Acts in Furtherance of the Drug Trafficking Conspiracy

31.     In furtherance of the Cartel's drug trafficking conspiracy, and to effect the illegal objects thereof, the defendants engaged in the acts described below, among others:

18

a.      In or about early 2021, RUBEN ROCHA MOYA, the defendant, was campaigning to become the Governor of Sinaloa. Around that time, and prior to his election in or about June 2021, ROCHA MOYA met with the then-leaders of the Cartel, including Ivan and Ovidio. At the meeting, which was protected by Cartel *sicarios* armed with machineguns and other weapons, Ivan and Ovidio promised that the Chapitos would ensure that ROCHA MOYA won the gubernatorial election. In exchange, ROCHA MOYA promised the Chapitos Leaders that, if elected, he would ensure that officials friendly to the Chapitos' drug trafficking would be placed in positions of authority in the government of Sinaloa.

b.      Prior to ROCHA MOYA's election, ENRIQUE DIAZ VEGA, the defendant, also met with Ivan, Alfredo, and other high-level members of the Cartel. At one such meeting, DIAZ gave the Chapitos Leaders a list of ROCHA MOYA's opponents and their addresses, so that the Chapitos could intimidate those opponents into dropping out of the election.

c.      After these meetings, and to help guarantee the election of ROCHA MOYA as Governor of Sinaloa, the Chapitos Leaders ordered Chapitos members and citizens in Sinaloa to vote for ROCHA MOYA. In addition, on election day in or about June 2021, on orders from Ivan, Cartel *sicarios* stole ballots and ballot boxes for the opposing party, and using the list that DIAZ had given the Chapitos Leaders of ROCHA MOYA's opponents and their addresses, kidnapped opponents of ROCHA MOYA and intimidated them into dropping out of the race. Moreover, to further influence the election results, officers in the Sinaloa State Police were forbidden by their commanders from approaching polling sites on election day, even if the officers observed criminal activity, or received a report about criminal activity from a citizen, at a polling site location. Officers in the Sinaloa State Police did in fact receive emergency calls on election day, reports of threats being made at the tolling booths directing voters to vote for favored

19

candidates, and reports of ballot boxes being stolen across Sinaloa, including in its major cities of Culiacan, Mazatlan, Navolato, and Elota. Officers also observed individuals at polling sites armed with guns and paddles to hit voters as a tactic to intimidate the voters into voting for favored candidates. As instructed, the officers did not intervene.

d.      After ROCHA MOYA was elected Governor, ROCHA MOYA and ENRIQUE INZUNZA CAZAREZ, the defendant, met with leaders of the Cartel, including the Chapitos Leaders. At that meeting, which was protected by Cartel *sicarios* armed with machineguns and other weapons, the Chapitos Leaders, ROCHA MOYA, and INZUNZA CAZAREZ discussed, among other things, the fact that the Chapitos had supported ROCHA MOYA's successful campaign, and that, in exchange, ROCHA MOYA would ensure that the Chapitos had control over the Sinaloa State Police, which would allow the Chapitos to carry out its drug trafficking operations without the risk of interference by state law enforcement. As part of this arrangement, members of the Chapitos have also coordinated with corrupt state and local law enforcement officials, including JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, to identify and arrest enemies or non-members of the Chapitos, ostensibly to aid the public perception of ROCHA MOYA and his administration as having improved law and order in Sinaloa.

e.      As Governor of Sinaloa, and as promised before his election, ROCHA MOYA has since ensured that the Chapitos have been able to consolidate and exercise near total control over state and local law enforcement agencies in Sinaloa, including the Sinaloa State Attorney General's Office, the Investigative Police for the Sinaloa State Attorney General's Office, the Sinaloa State Police, and the Culiacan Municipal Police.

20

f.      To maintain control over the Sinaloa State Attorney General's Office, for example, the Chapitos, from at least in or about 2021, through at least in or about September 2024, paid approximately $11,000 U.S. dollars in monthly cash bribes to DAMASO CASTRO ZAAVEDRA, the defendant, in his capacity as Deputy Attorney General for the Sinaloa State Attorney General's Office. In exchange, ZAAVEDRA provided the Chapitos with protection against arrest and gave the Chapitos advance notice of law enforcement operations against it involving the DEA, including information about which Chapitos drug labs and members being targeted by the DEA.

g.      The Chapitos' control over corrupt officials in Sinaloa has flourished while ROCHA MOYA has been Governor of Sinaloa, but it did not begin with his election. For example, from at least in or about 2017 to at least in or about November 2022, MARCO ANTONIO ALMANZA AVILES, the defendant, and then from at least in or about in or about November 2022 to in or about February 2026, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," the defendant, each in his capacity as the head of the Investigative Police for the Sinaloa State Attorney General's Office, accepted approximately $16,000 U.S. dollars in monthly cash bribes from the Chapitos. In exchange, AVILES and then his successor, CONTRERAS NUNEZ, allowed the Chapitos to operate freely within Sinaloa, including with respect to its drug trafficking activities, and helped the Chapitos maintain its stronghold over Sinaloa. For example, AVILES allowed vehicles transporting chemicals used to produce the Chapitos' fentanyl to pass through Culiacan without interference, issued arrest warrants for enemies of the Chapitos at the Chapitos' request, and ordered the release of members of the Chapitos who had been arrested for their drug trafficking activities. This corrupt agreement between AVILES and the Chapitos was initially discussed and established at a meeting that occurred in or about 2017 or 2018, between

21

AVILES and Chapitos Leaders Ivan and Ovidio at one of Ivan's ranches in Sinaloa. In addition, until Ivan stopped the practice in or about 2020, and with the approval of the Chapitos Leaders, AVILES collected fees from labs that manufactured methamphetamine for drug traffickers other than the Chapitos (including drug traffickers who worked for other factions within the Cartel), in order to increase the cost of their drug trafficking and himself profit from that drug trafficking activity. Similarly, CONTRERAS NUNEZ, who was selected as the head of the Investigative Police by ROCHA MOYA with the explicit approval of the Chapitos Leaders, ordered the release of Chapitos members who had been arrested for their drug trafficking activities and helped the Chapitos track down and kill its enemies, including rival cartel members.

h.    In or about 2023 and 2024, GERARDO MERIDA SANCHEZ, the defendant, as the Secretary of Public Security for Sinaloa, accepted more than $100,000 U.S. dollars in monthly cash bribes from the Chapitos. In exchange, SANCHEZ did not interfere with the Chapitos' drug trafficking operations, including by not arresting its members, and gave the Chapitos advance notice of upcoming law enforcement operations, including advance notice of raids of drug labs. In or about 2023, for example, SANCHEZ warned the Chapitos in advance of at least 10 raids of drug labs, allowing the Chapitos to evacuate personnel and drugs from the labs before the police were able to seize the materials or arrest Chapitos members.

i.    From at least in or about 2012 to at least in or about 2024, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," the defendant, in the various high-level positions he held within the Sinaloa State Police, accepted approximately $6,000 U.S. dollars in monthly cash bribes from the Chapitos, and, in exchange, protected the Chapitos, including by not arresting members of the Chapitos who were carrying drugs and/or firearms, and by authorizing the release of members of the Chapitos who had been arrested. For example, from at least in or

22

about 2017 to at least in or about 2022, in exchange for the monthly cash bribes he received from the Chapitos as the Deputy Director of the Sinaloa State Police, HIPOLITO allowed the Chapitos to operate in his jurisdiction without interference, placed other police officers who were on the Chapitos' payroll in positions of power within the Sinaloa State Police, sold ammunition and magazines for assault rifles to members of the Chapitos, and ordered the release of Chapitos members who were arrested for carrying firearms and had their arrest paperwork modified so that it appeared that they had not been armed. During that same period, HIPOLITO also gave the Chapitos advance notice of law enforcement operations against the Chapitos, allowing the Chapitos, for example, to evacuate personnel and drugs from a lab that was about to be searched by the Mexican army.

j.      Moreover, while Deputy Director of the Sinaloa State Police, HIPOLITO and certain commanders under his control met with Ivan and Ovidio. At one such meeting, HIPOLITO and the commanders confirmed that they were at the Chapitos' service and agreed to inform them about future assignments that HIPOLITO and his commanders received from the Security of Public Security for Sinaloa, including assignments relating to anti-narcotics operations. At that meeting, Ivan and Ovidio gave HIPOLITO and the commanders a radio and instructed them to stay in touch with the Chapitos, which HIPOLITO and the commanders proceeded to do after the meeting.

k.      Since in or about June 2022, JUAN DE DIOS GAMEZ MENDIVIL, the defendant, as Mayor of Culiacan, has accepted more than $10,000 U.S. dollars in monthly cash bribes from the Chapitos. In exchange, MENDIVIL—who as Mayor has authority over the Municipal Police in Culiacan—has allowed the Chapitos to operate in Culiacan without government interference.

l.      From at least in or about 2018 through at least in or about 2024, JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendant, a high-level commander in the Culiacan Municipal Police, accepted approximately $41,000 U.S. dollars in monthly cash bribes from the Chapitos, to be allocated among MILLAN and other corrupt officers in his police force. In exchange, MILLAN gave the Chapitos full access to the intelligence, operations, and resources of the Culiacan Municipal Police, including access to police patrol cars and radios, for purposes of supporting the Chapitos' drug trafficking operations and associated violence, and commanded officers in the Culiacan Municipal Police to pick up from labs and transport, on behalf of the Chapitos, narcotics, including fentanyl and methamphetamine destined for the United States. In addition, MILLAN and his police force directly assisted the Chapitos in kidnapping and murdering its enemies, including, in or about October 2023, the kidnappings and murders of the CS and the CS's relatives, in retaliation for the CS's cooperation with the DEA in connection with the investigation and prosecution of the Chapitos Leaders and other high-level Cartel members in this case. Specifically, in or about October 2023, Ivan and another senior member of the Chapitos ordered the kidnappings and murders of the CS and his relatives, including a 13-year-old boy. MILLAN and his officers assisted with the kidnappings. Under MILLAN's command, municipal officers, in a patrol car, stopped the CS and another victim, kidnapped them, and turned them over to Cartel *sicarios*, who tortured and then killed those and other victims. MILLAN also instructed his officers to conduct surveillance on and detain other civilians at gunpoint in connection with the Chapitos' efforts to find and apprehend other victims who were subsequently kidnapped and murdered by the Chapitos for their relation to the CS.

24

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Narcotics Importation Conspiracy)

32.    The allegations contained in paragraphs 1 through 31 of this Indictment are incorporated as though fully set forth herein.

33.    From at least in or about 2012, up to and including on or about the date of the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

34.    It was a part and an object of the conspiracy that RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, and others known and unknown, would and did import into the United States and into the customs territory of the United States from a place outside

25

thereof controlled substances, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

35.    It was further a part and an object of the conspiracy that RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute controlled substances, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

36.    It was further a part and an object of the conspiracy that RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

37.    The controlled substances that RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO

ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture, distribute, and possess with intent to distribute, intending, knowing, and having reasonable cause to believe that such substances would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, and (iii) manufacture, distribute, and possess with intent to distribute on board an aircraft registered in the United States, were: (a) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 960(b)(1)(F); (b) one kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 960(b)(1)(A); (c) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B); and (d) 50 grams and more of mixtures and substances containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Section 960(b)(1)(H).

(Title 21, United States Code, Section 963; and Title 18, United States Code, Section 3238.)

## COUNT TWO
### (Possession of Machineguns and Destructive Devices)

The Grand Jury further charges:

38.     The allegations contained in paragraphs 1 through 31 of this Indictment are incorporated as though fully set forth herein.

39.     From at least in or about 2012, up to and including on or about the date of the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in

an offense begun and committed out of the jurisdiction of any particular State or district, and for which at least one of two or more joint offenders has been first brought to and arrested in the Southern District of New York, RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the offense charged in Count One of this Indictment, knowingly used and carried firearms, and, in furtherance of such a crime, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), 3238, and 2.)

## COUNT THREE
**(Conspiracy to Possess Machineguns and Destructive Devices)**

The Grand Jury further charges:

40. The allegations contained in paragraphs 1 through 31 of this Indictment are incorporated as though fully set forth herein.

41. From at least in or about 2012, up to and including on or about the date of the filing of this Indictment, in the Southern District of New York, Mexico, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE

28

CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

42.    It was a part and an object of the conspiracy that RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the offense charged in Count One of this Indictment, knowingly use and carry firearms, and, in furtherance of such a crime, knowingly possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

## COUNT FOUR
### (Kidnapping Resulting in Death)

The Grand Jury further charges:

43.    The allegations contained in paragraphs 1 through 31 of this Indictment are incorporated as though fully set forth herein.

29

44.     In or about October 2023, in Mexico and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, and for which at least one of two or more joint offenders has been first brought to and arrested in the Southern District of New York, JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendant, knowingly and unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away and held for ransom and reward and otherwise a person or persons, each of whom was willfully transported in interstate and foreign commerce, and MILLAN traveled in interstate and foreign commerce and used the mail and a means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of committing the offense, and aided and abetted the same, resulting in death, to wit, MILLAN kidnapped, procured, and aided and abetted the kidnappings of a confidential source for the DEA, namely, victim Alexander Meza Leon (the CS), and a relative of the CS ("CS Relative-1"), resulting in the deaths of the CS and CS Relative-1, in retaliation for the provision of information by the CS to the DEA concerning the narcotics trafficking activities of Ivan and his associates, and MILLAN, Ivan, and their co-conspirators used cellphones to communicate in furtherance of the kidnappings.

(Title 18, United States Code, Sections 1201(a)(1), 3238, and 2.)

## COUNT FIVE
### (Conspiracy to Commit Kidnapping Resulting in Death)

The Grand Jury further charges:

45.     The allegations contained in paragraphs 1 through 31 of this Indictment are incorporated as though fully set forth herein.

46.     In or about October 2023, in Mexico and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendant, and others known and unknown, at least one of whom

has been first brought to and arrested in the Southern District of New York, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to kidnap certain individuals (namely, the CS and CS Relative-1), in violation of Title 18, United States Code, Section 1201(a).

47.     It was a part and an object of the conspiracy that JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendant, and others known and unknown, would and did knowingly and unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away, and hold for ransom and reward and otherwise CS and CS Relative-1, and CS and CS Relative-1 each would be and were willfully transported in interstate and foreign commerce, and MILLAN would and did travel in interstate and foreign commerce and use the mail and a means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of committing the offense, in violation of Title 18, United States Code, Section 1201(a)(1), resulting in death, to wit, MILLAN, agreed and worked with others to kidnap and procure the kidnappings of the CS and CS Relative-1 in retaliation for the CS providing information to the DEA concerning the narcotics trafficking activities of Ivan and his associates, and MILLAN, Ivan, and their co-conspirators used cellphones to communicate in furtherance of the kidnappings, which resulted in the deaths of the CS and CS Relative-1.

### Overt Acts

48.     In furtherance of the conspiracy and to effect the illegal object thereof, on or about October 22, 2023, JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendant, kidnapped and caused the kidnappings of the CS and CS Relative-1 in or around Culiacan, Mexico, in retaliation for the provision of information by the CS to the DEA concerning the narcotics trafficking activities of Ivan and his associates, during which kidnapping the CS and CS Relative-

31

1 were killed. Specifically, under MILLAN's command, municipal officers, in a patrol car, stopped the CS and CS Relative-1, kidnapped them, and turned them over to Cartel *sicarios*, who tortured and then killed those and other victims.

(Title 18, United States Code, Sections 1201(c) and 3238.)

## FORFEITURE ALLEGATIONS

49.     As a result of committing the controlled substance offense charged in Count One of this Indictment, RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as a result of the offense, and any and all property used, or intended to be used, in any manner or part, to commit, and to facilitate the commission of, the offense charged in Count One of this Indictment.

50.     As a result of committing the firearms offenses charged in Counts Two and Three of this Indictment, RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d), all

32

firearms and ammunition involved in and used in the commission of the offenses charged in Counts Two and Three of this Indictment.

51.    As a result of committing the kidnapping offenses charged in Counts Four and Five of this Indictment, JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

52.    If any of the above-described forfeitable property, as a result of any act or omission of RUBEN ROCHA MOYA, ENRIQUE INZUNZA CAZAREZ, ENRIQUE DIAZ VEGA, DAMASO CASTRO ZAAVEDRA, MARCO ANTONIO ALMANZA AVILES, ALBERTO JORGE CONTRERAS NUNEZ, a/k/a "Cholo," GERARDO MERIDA SANCHEZ, JOSE ANTONIO DIONISIO HIPOLITO, a/k/a "Tornado," JUAN DE DIOS GAMEZ MENDIVIL, and JUAN VALENZUELA MILLAN, a/k/a "Juanito," the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty,

33

it is the intent of the United States, pursuant to Title 21, United States Code, Sections 853(p) and

970, and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property

of the defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 and 970;
Title 18, United States Code, Sections 924(d); and
Title 28, United States Code, Section 2461(c).)

FOREPERSON

JAY CLAYTON
United States Attorney

34