**LEONARDO M. ALDRIDGE**
**Attorney-At-Law**
**20 Vesey St. Suite 400**
**New York, NY 10007**

May 29, 2026

**BY ELECTRONIC FILING**

Hon. Katherine Polk Failla
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

**U.S. v. Juan Pablo Lozano, 23-cr-180 (KPF) – Sentencing Submission**

Your Honor:

**I. Introduction**

Juan Pablo Lozano was born dead.

He was delivered with his umbilical cord wrapped around his neck, which deprived him of oxygen and left him appearing lifeless and blue at birth. Doctors resuscitated him. He remained hospitalized afterward in an incubator for weeks. Family members were told it was a miracle he survived.

Perhaps Juan Pablo Lozano's entry into this world was a warning — or an omen — of the hardships that would follow him throughout his life. During infancy and early childhood, he suffered years of convulsions and neurological complications while his family, bouncing between El Paso in Texas and Ciudad Juárez in Mexico, struggled simply to obtain affordable medical care.

That is how Juan Pablo's life began. For the next thirty-three years, it did not become easier. The chokehold that nearly killed him at birth simply changed form. It became poverty. Addiction. Abandonment. Homelessness. Incarceration.

Juan Pablo was not born into ordinary poverty. He was born into a family struggling with addiction, illness, and chronic instability long before he was old enough to understand any of it.

1

Most of the adults surrounding Mr. Lozano during his childhood were consumed by alcoholism, drug addiction, incarceration, violence, and dysfunction. His biological father never meaningfully acknowledged or supported him. The man who raised him died from alcoholism while Mr. Lozano was still a child. His mother was drug-addicted and later suffered devastating strokes that left her paralyzed, bedridden, and unable to speak. By adolescence, instead of experiencing anything remotely resembling a normal childhood, Mr. Lozano was helping care for his disabled mother while simultaneously falling into severe substance abuse.

Mr. Lozano's story is not simply one of criminal conduct. It is, instead, the story of a child raised amid extraordinary instability, emotional collapse, untreated trauma, grief, addiction, and deprivation from early childhood.

He has pleaded guilty and accepted responsibility for his conduct. He understands the gravity of the offense before the Court. But sentencing under 18 U.S.C. § 3553(a) requires individualized judgment. As the Supreme Court recognized in *Gall v. United States*, sentencing courts must make "an individualized assessment based on the facts presented." 552 U.S. 38, 50 (2007).

The Supreme Court has repeatedly emphasized that sentencing courts must possess "the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York*, 337 U.S. 241, 247 (1949). Most recently, the Court reaffirmed in *Concepcion v. United States* that federal sentencing proceedings permit courts to consider all relevant information at a sentencing hearing, consistent with their responsibility to sentence the "whole person" before them. 597 U.S. 481, 488 (2022).

And here, the life history of Juan Pablo reveals a man whose criminal conduct cannot be meaningfully separated from his harrowing upbringing.

Four considerations drive the defense request for a substantial variance. First, the advisory Guideline range is artificially inflated by the attribution of approximately 36 kilograms of fentanyl under conspiracy principles despite Mr. Lozano's far narrower personal conduct. Second, Criminal History Category VI substantially overstates both the seriousness of Mr. Lozano's criminal history and the likelihood of future recidivism, as every criminal history point was accumulated between the ages of 18 and 24 during the most dysfunctional and addiction-ridden period of his life. Third, Mr. Lozano's offense conduct occurred against the backdrop of a severe fentanyl addiction that eventually deteriorated to the point where he was at times compensated with fentanyl pills for his own consumption. And fourth, Juan Pablo has shown meaningful rehabilitation, educational achievement, emotional maturation, and a commitment to treatment while incarcerated. Taken together, those facts demonstrate why the advisory range is far greater than necessary here.

The advisory Guideline range of 30 to 40 years greatly overstates the sentence necessary to satisfy the purposes of sentencing under § 3553(a). A sentence substantially below the advisory

2

range would still constitute profound punishment, would fully promote respect for the law, would provide substantial deterrence, and would protect the public, while also recognizing the extraordinary mitigating circumstances that shaped the life of the person now before the Court.

Mr. Lozano respectfully suggests 72 months of imprisonment as sufficient but not greater than necessary punishment to achieve the goals of sentencing established by Congress.

## II. Mr. Lozano's Childhood

Mr. Lozano's upbringing was marked by instability and dysfunction from the very beginning. Family members described years of convulsions and neurological complications throughout infancy and childhood. Mr. Lozano's family lacked financial resources even for consistent medical care. Relatives explain that treatment frequently occurred in Ciudad Juárez because medical services there were less expensive than in El Paso.

Mr. Lozano's family structure was equally unstable. He was born from an extramarital relationship, and his biological father never meaningfully acknowledged or supported him. He was instead raised by another man whose alcoholism ultimately resulted in his death while Mr. Lozano was still a child.

Virtually every adult surrounding Mr. Lozano during childhood struggled with alcoholism, narcotics abuse, incarceration, or profound dysfunction. Addiction was not an outside influence entering an otherwise stable environment; it was part of the environment itself. As reflected in the PSR, Mr. Lozano's mother suffered from severe cocaine addiction. PSR ¶ 88. By the age of 7, Mr. Lozano had already been exposed to narcotics inside the family home and understood, even at that tender age, what was occurring around him. When his parents hosted parties centered around alcohol and drug consumption, he was frequently sent away to stay with his aunt, Josephine Beard, while the adults became intoxicated. The household was further marked by violence. As reflected in the PSR, Mr. Lozano personally witnessed his father physically abuse his mother. PSR ¶ 89. Long before he ever consumed narcotics himself, addiction and violence had become normalized features of daily life.

As a child, Mr. Lozano moved repeatedly between Ciudad Juárez and El Paso, often depending upon relatives for shelter and stability. The instability only deepened when his mother suffered multiple devastating strokes that ultimately left her paralyzed, bedridden, and unable to speak.

Instead of experiencing anything remotely resembling a normal adolescence, Mr. Lozano became part of the caregiving structure within a medically devastated household. Family members consistently describe him traveling between El Paso and Ciudad Juárez to help care for his paralyzed mother while his sister struggled to maintain employment and support the household financially.

Those responsibilities included hospital stays, helping with hygiene and caregiving tasks, and attempting to maintain some semblance of family stability while still children themselves. In a letter submitted to the Court, his sister explained simply: "it was only him and I."

The trauma did not stop there. Mr. Lozano's older brother spent substantial portions of his life incarcerated before eventually being murdered in cartel violence. Mr. Lozano could not attend the funeral because he himself was incarcerated at the time.

By adolescence, Mr. Lozano had descended into daily abuse of alcohol, marijuana, cocaine, and eventually methamphetamine. That trajectory was tragically predictable. After his own parents' drug abuse, Mr. Lozano unsurprisingly began experimenting with drugs when he was only 10 years old. The adults who surrounded him had modeled little else. From his earliest memories, narcotics, intoxication, neglect, and violence were woven into the fabric of everyday life.

His addiction continued to evolve as he entered adulthood. According to the PSR and mitigation materials, Mr. Lozano began using fentanyl in approximately 2020 following injuries sustained in a motor-vehicle accident, initially turning to the drug as a form of pain relief. What followed was a devastating addiction that increasingly controlled his decision-making and ultimately contributed to the conduct before the Court.

Mr. Lozano's history shows that he did not descend into addiction despite structure, support, stability, and opportunity. The Court is sentencing a man whose formative years were simply brutal, with a mother and father who prioritized drug use over protecting and nurturing him. It is sentencing a man who saw cocaine in his home at 7 and started using shortly thereafter.

The Supreme Court has repeatedly recognized that youth and immaturity diminish culpability and increase vulnerability to dysfunctional environments. See *Miller v. Alabama*, 567 U.S. 460, 471-72 (2012). Much of the criminal history now driving the advisory Guideline range stems from conduct committed while Mr. Lozano was still an addicted, unstable, and profoundly traumatized teenager.





Mr. Lozano as a young child

### III. Positive Section 3553 Factors

Despite the instability and dysfunction surrounding his upbringing, the letters submitted to the Court reveal that meaningful human qualities endured and, improbably, even flourished throughout Mr. Lozano's life.

In a letter to the Court, Juan Pablo's sister describes him not as a hardened criminal, but as the person who remained beside her when their family collapsed. After their mother became paralyzed from multiple strokes, she describes the two of them caring for their disabled mother together while trying to survive economically and emotionally. "It was only him and I", she remembered.

Another relative wrote that despite his addiction struggles, "Juan Pablo always had a good heart." Others described him as "respectful," "hardworking," and "someone who was always willing to help." One longtime acquaintance wrote to the Court that Mr. Lozano "never slacked

5

off" from work responsibilities and routinely worked roofing, landscaping, maintenance, and construction jobs to support himself and those around him.

The PSR likewise reflects a consistent history of lawful employment. Throughout his adult life, Mr. Lozano maintained steady employment in construction, roofing, landscaping, maintenance, and related trades. When addiction was not controlling his life, Mr. Lozano possessed both the ability and willingness to function productively in society. Friends, employers, and acquaintances consistently describe him as dependable, hardworking, and well liked. Mr. Lozano repeatedly demonstrated an ability to work and support himself whenever addiction loosened its grip on his life.

Perhaps most importantly, multiple family members consistently distinguish between the person they know and the addiction that consumed him. His sister explained plainly that "his drug addiction influenced and diverted him from the right path." That observation is consistent not only with the family submissions, but with the PSR itself, which documents years of severe daily abuse of alcohol, cocaine, methamphetamine, marijuana, and fentanyl.

The letters also reveal a man capable of emotional attachment, caregiving, and loyalty. Several relatives describe him helping care for sick family members, supporting children who had lost their father, and remaining emotionally present for loved ones even while battling profound addiction himself.

Mr. Lozano helped raise the three children of his longtime partner, April Cadena, with whom he maintained a relationship from approximately 2011 through 2022. PSR ¶ 93. Those are actions that, more than words, show that Juan Pablo can commit, that he has empathy, and that he has true concern for others. In short, it shows his humanity. Juan Pablo is a man capable of maintaining meaningful family relationships and assuming parental responsibilities even while struggling with severe addiction. The fact that he helped raise children who were not biologically his own speaks volumes about his capacity for loyalty, emotional connection, and caregiving.

Juan Pablo undoubtedly committed a serious crime when he engaged in illicit activities related to drug and weapons, but he also worked steadily, helped raise three children who were not his own, cared for his disabled mother, and has taken meaningful steps toward rehabilitation while incarcerated.

## IV. Acceptance of Responsibility and Rehabilitation

Mr. Lozano pleaded guilty and accepted responsibility for his conduct. He did not force the Government to prepare for trial nor meet its burden. He has also demonstrated meaningful rehabilitative efforts while incarcerated.

According to the PSR and supporting institutional records, Mr. Lozano completed multiple educational and therapeutic programs while in federal custody, including courses involving

conflict resolution, entrepreneurship, cognitive behavioral therapy, emotional management, reading programs, and behavioral development.

These accomplishments matter because they show that Mr. Lozano is trying to change. They show that Mr. Lozano is confronting longstanding emotional dysfunction, addiction issues, impulsivity, and behavioral instability that have defined much of his life since childhood.

Significantly, the PSR further reflects that Mr. Lozano independently sought mental-health treatment while incarcerated. PSR ¶ 100. That fact deserves particular emphasis. Participation in institutional programming is commendable. Seeking mental-health treatment reflects something deeper: it is recognition that help is needed and a willingness to confront longstanding emotional and psychological issues. It demonstrates insight, accountability, and a genuine desire for change.

This is especially significant when viewed against the backdrop of Mr. Lozano's life history. For decades, addiction, violence, instability, and emotional dysfunction were normalized in the environment in which he was raised. The fact that Mr. Lozano has now voluntarily sought professional assistance reflects a level of self-awareness and maturity that was absent throughout much of his earlier life. Rather than continuing to deny his problems, he has begun confronting them.

The Bureau of Prisons information reflected in the PSR further demonstrates that Mr. Lozano incurred only one disciplinary sanction during this lengthy period of incarceration — a relatively minor infraction involving refusal to obey an order that resulted in temporary loss of visitation privileges. The overall institutional record instead reflects stability, engagement, and self-improvement.

In *Pepper v. United States*, the Supreme Court reaffirmed that "highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." 562 U.S. 476, 480 (2011) (quoting *Williams*, 337 U.S. at 247). The Court further explained that evidence of post-offense rehabilitation bears directly on several § 3553(a) factors because it provides "the most up-to-date picture" of the defendant's "history and characteristics." *Id*. at 492. *Pepper* recognizes what common sense suggests: the best evidence of who a defendant is today is often what he has done since the offense conduct. Here, that record favors leniency.

Juan Pablo has demonstrated meaningful rehabilitative efforts and substantial evidence of emotional maturation and institutional adjustment. He has not remained idle during incarceration but rather has made the most of his time with the limited offerings and harsh conditions at the MDC in Brooklyn. Juan Pablo has used his time in custody to pursue educational opportunities,

engage in therapeutic programming, seek mental-health treatment, and begin addressing the addiction and emotional dysfunction that have haunted him since childhood.



Mr. Lozano at Elementary Graduation

## V. Deconstructing Mr. Lozano's Criminal History Category and the Guidelines

The advisory Guideline range in this case is driven substantially by Criminal History Category VI — the highest criminal history category available under the Sentencing Guidelines. But a close examination of the actual convictions underlying that category demonstrates how profoundly misleading that designation can be when viewed outside the sterile arithmetic of the Guidelines calculation.

Criminal History Category VI is ordinarily associated with hardened violent recidivists, entrenched organized criminals, career armed offenders, or defendants whose records demonstrate escalating predatory violence over time. That is not who Mr. Lozano is.

The overwhelming majority of Mr. Lozano's prior convictions involve low-level property crimes, addiction-fueled conduct, or offenses committed while he was still a deeply unstable teenager suffering from severe and untreated substance abuse. Most importantly, the PSR does not reflect a criminal history involving firearms, organized violent conduct, sophisticated criminal planning, or the type of escalating predatory behavior ordinarily associated with Category VI offenders.

One of the principal drivers of the criminal history score is a 2011 robbery conviction committed when Mr. Lozano was only 18 years old. That offense did not involve the use of a firearm or weapon. According to the PSR, the offense began as a vehicle burglary and escalated

8

only after the owner confronted Mr. Lozano. The offense ultimately generated three criminal history points after probation was revoked, and nearly fifteen years later it still substantially drives the advisory range before this Court. The burglary of a vehicle when Juan Pablo was 19 ensued. He was sentenced to 80 days of imprisonment and thus received two criminal history points. At 21, a possession of marihuana charge where he received 5 days of jail generated one criminal history point. Also at 21, Juan Pablo was sentenced to 9 months of prison for burglary of vehicles with two or more convictions, generating an additional two criminal history points. At 22, he was caught driving while intoxicated, given 20 days of jail, and generating one additional criminal history point. At 23, Juan Pablo was involved in an incident – charged as an assault that resulted in 160 days of imprisonment – that had all the signs of the deep drug addiction he was under at the time. That produced two criminal history points. At 24, Mr. Lozano was convicted with assault in an incident where, according to the PSR, officers "encountered Lozano who was walking out of the front door while holding beer cans and noticed he was bleeding from the right wrist." Again, this conviction – producing two criminal history points – has all the telltale signs of being in the grip of full-fledge drug addiction and alcoholism.

Mr. Lozano's criminal history shows not sophistication but rather dysfunction. The offenses reveal chaos, addiction, and impulsivity. They do not reflect the profile of a calculating career criminal exercising control, leadership, or strategic criminal planning.

All 13 criminal history points that place Mr. Lozano in Criminal History Category VI were accumulated between ages 18 and 24 for the crimes described above. The Guidelines therefore treat conduct committed during a relatively compressed six-year period of profound addiction, instability, immaturity, and emotional dysfunction as permanently defining Mr. Lozano's criminal history. That treatment obscures an important reality.

Criminal History Category VI exists largely because prior convictions are supposed to help predict future criminal conduct. The problem here is that all 13 points accumulated between ages 18 and 24, during a relatively brief period dominated by addiction and instability. That history is very different from the decades-long pattern of recidivism often associated with Category VI offenders.

The U.S. Sentencing Commission itself has recognized that criminal history categories can sometimes overstate both the seriousness of a defendant's criminal history and the likelihood of recidivism. See U.S.S.G. §4A1.3(b). This is such a case. The crimes listed in the PSR are a compressed cluster of largely addiction-driven offenses committed during a relatively brief period between ages 18 and 24 rather than the type of decades-long pattern of persistent criminality often associated with Category VI offenders. The resulting criminal history score therefore substantially exaggerates the predictive value ordinarily attributed to Criminal History Category VI and warrants careful scrutiny under §3553(a).

Mr. Lozano was arrested in the Western District of Texas relevant-conduct case in 2023, meaning that he had remained free from new criminal convictions for approximately five years.

9

While not erasing his criminal record, that period significantly undermines the notion that he is the type of relentless recidivist ordinarily associated with Criminal History Category VI.

The Guidelines flatten all of this history into arithmetic. Three points here. Two points there. Another enhancement layered on top. But arithmetic alone cannot capture the distinction between an addicted, unstable teenager committing low-level property offenses and the type of violent recidivist for whom Criminal History Category VI was truly designed.

Furthermore, although Mr. Lozano is legally accountable under conspiracy principles for the approximately 36 kilograms of fentanyl attributed in this case, the Court should nevertheless recognize the enormous disconnect between that aggregate conspiracy quantity and Mr. Lozano's own actual hands-on conduct. The Guidelines' drug-quantity framework mechanically attributes to an individual defendant the reasonably foreseeable conduct of the broader conspiracy, even where the defendant himself never personally handled, possessed, transported, or distributed anything remotely approaching that amount. That legal attribution dramatically increases the base offense level here and correspondingly inflates the adjusted Guideline range.

Put differently, the advisory Guideline range is being driven not by the amount Mr. Lozano himself actually handled, but by the arithmetic consequences of conspiracy liability. Section 3553(a), however, requires an individualized assessment of the defendant before the Court, not merely a mechanical adoption of aggregate conspiracy metrics untethered from Mr. Lozano's own real-world conduct.

Mr. Lozano admitted in a post-arrest interview that he personally smuggled approximately 100 fentanyl pills on roughly six prior occasions. The difference between personally trafficking approximately six hundred fentanyl pills and being held legally accountable for approximately thirty-six kilograms of fentanyl is the difference between an individualized assessment and a conspiracy-wide attribution. The Guidelines require the latter calculation. Section 3553(a) permits the Court to recognize the former reality.

The Court should also consider the extent to which Mr. Lozano himself had become consumed by addiction. Mr. Lozano began using fentanyl in approximately 2020 following injuries sustained in a motor-vehicle accident, initially turning to the drug as a form of pain relief. At the height of his addiction, Mr. Lozano had deteriorated to the point that he was sometimes compensated for criminal conduct not with money, but with fentanyl pills for his own consumption. That fact does not excuse his conduct. It does, however, reveal the extent to which addiction had consumed his life. This is not a case involving a defendant who amassed wealth, status, or power from narcotics trafficking. It is, in many respects, a case involving a man who became addicted to the very poison that ultimately fueled his criminal conduct.

As the Supreme Court recognized in *Kimbrough v. United States*, district courts retain discretion to impose sentences outside the advisory Guideline range where the Guidelines fail to properly reflect the purposes of sentencing set forth in §3553(a). 552 U.S. 85, 101 (2007). The

10

Second Circuit has likewise emphasized that sentencing courts may vary where the Guidelines "fail properly to reflect §3553(a) considerations." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (*en banc*).

The arithmetic underlying Criminal History Category VI treats Mr. Lozano as one of the federal system's most hardened recidivists. Yet the underlying convictions, as described above, reveal something fundamentally different.

The government itself implicitly recognized that the advisory Guideline range overstates the sentence necessary in this case. Although preserving the Court's discretion under 21 U.S.C. §841(b)(1)(B), the government nevertheless agreed that — absent unforeseen circumstances — it would not advocate for a sentence above 20 years imprisonment. While preserving the Court's ultimate sentencing authority, that agreement reflects recognition that a sentence aligned with the 20-year statutory maximum associated with §841(b)(1)(C) would still adequately satisfy the purposes of sentencing under §3553(a).

The Second Circuit has repeatedly emphasized that district courts possess discretion to impose individualized sentences under §3553(a). *Cavera*, 550 F.3d at 188-89. The advisory Guidelines remain only one factor among many that sentencing courts must consider. *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008).

Several factors support a substantial variance below the advisory Guideline range here.

First, the criminal history score itself is driven overwhelmingly by addiction-fueled conduct beginning during adolescence and continuing through years of untreated substance abuse and emotional instability. Moreover, all 13 criminal history points were accumulated between the ages of 18 and 24, during the most chaotic and addiction-ridden period of Mr. Lozano's life.

Second, there is extraordinary mitigating history rarely seen at this level of severity: neurological complications at birth, childhood instability, abandonment, parental addiction, domestic violence, exposure to narcotics from childhood, caregiving responsibilities for a paralyzed parent while still a child, exposure to violence and death, and profound untreated trauma beginning in childhood.

Third, Mr. Lozano has shown meaningful rehabilitative potential. He has engaged in therapeutic and educational programming while incarcerated, sought mental-health treatment, and demonstrated emotional maturation and self-reflection.

Fourth, the Court should recognize that Mr. Lozano's conduct occurred against the backdrop of a severe fentanyl addiction that ultimately consumed his life. This is not a case involving a defendant who trafficked narcotics while remaining detached from the consequences

of those drugs. Mr. Lozano became addicted to fentanyl himself and, at times, was compensated with fentanyl pills rather than money.

And fifth, a substantial sentence below the advisory Guideline range would still constitute serious punishment. Mr. Lozano has already spent years incarcerated under difficult conditions and has not had significant disciplinary infractions. On the contrary, he has taken advantage of the limited rehabilitative programming available to him while housed at MDC-Brooklyn.

## VI. Conclusion

Mr. Lozano is much more than his criminal conduct. His life was shaped from earliest childhood by abandonment, instability, neurological complications, addiction, poverty, trauma, grief, domestic violence, and untreated emotional dysfunction. By the age of 7 he had already been exposed to narcotics inside his home. By the age of 10 he had begun experimenting with drugs himself. The adults who should have protected him instead led him to addiction and criminality.

The years that followed were marked by loss upon loss. He watched his mother succumb to addiction and later devastating strokes. He witnessed domestic violence in the home. He helped care for a paralyzed parent while still a child himself. He lost the man who raised him to alcoholism. He lost his brother to cartel violence. He eventually developed a severe fentanyl addiction following a motor-vehicle accident, an addiction that ultimately became so consuming that he was at times paid in fentanyl pills rather than money.

Yet the sorrow, deep as it is, is not the entire story.

Juan Pablo is capable of work, caregiving, emotional attachment, and change. He maintained steady employment throughout much of his adult life. He helped raise the three children of his longtime partner for more than a decade. He accepted responsibility for his conduct. He has pursued educational and therapeutic programming while incarcerated. He independently sought mental-health treatment. And he has demonstrated meaningful signs of rehabilitation and emotional growth.

A sentence of 72 months will remove Mr. Lozano from society for years, punish him severely, deter future misconduct, and be followed by a lengthy period of supervision. The question before the Court is not whether Mr. Lozano deserves punishment. He does. The question is whether a harsher sentence is necessary to accomplish the goals of sentencing set forth in §3553(a). Given the addiction-driven nature of both his criminal history and offense conduct, the overstatement inherent in the Criminal History Category VI designation, his demonstrated rehabilitation, and the substantial punishment already inherent in a six-year federal sentence, the answer is no.

12

The Guidelines describe a Category VI offender responsible for approximately thirty-six kilograms of fentanyl. But the record is far more complicated. It describes a man whose criminal history accumulated during a brief period of severe addiction, who became addicted to fentanyl himself, who helped raise children, who worked steadily throughout much of his life, who sought treatment while incarcerated, and who has demonstrated meaningful rehabilitation.

Lastly, as per ¶117 of the PSR, Mr. Lozano respectfully requests that the sentence imposed by this Court: (1) run concurrently with the five-year term of imprisonment imposed in United States v. Lozano, Cr. No. 22-1656, in the United States District Court for the Western District of Texas, El Paso Division; and (2) be adjusted pursuant to U.S.S.G. § 5G1.3 to account for the time Mr. Lozano has already served on that federal sentence, which the parties agree constitutes relevant conduct to the instant offense.

Respectfully submitted,

*S/Leonardo M. Aldridge*
*S/Mark Demarco*
*S/Ezra Spilke*

Attorneys for Mr. Juan Pablo Lozano

Attachments: Letters of Support; Certifications from the BOP

Cc. AUSAs Sarah L. Kushner, David Robles, Jane Chong

13