

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 10, 2026

**BY ECF**

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

       **Re:** *United States v. Julio Marin Gonzalez*, 23 Cr. 180 (KPF)

Dear Judge Failla:

       The Government respectfully submits this letter in advance of the June 17, 2026 sentencing of defendant Julio Marin Gonzalez following his guilty plea for conspiring to import fentanyl into the United States. For the reasons set forth below, the Government respectfully submits that a substantial sentence, above 80 months' imprisonment but below the range of 135 to 168 months' imprisonment (the "Stipulated Guidelines Range") calculated and stipulated to by the parties under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines"), would be sufficient but not greater than necessary to achieve the purposes of sentencing.

## I. Offense Conduct

       The Sinaloa Cartel is a primary distributor of fentanyl to the United States and relies upon, among others, money launderers and traffickers who, among other things, direct, supervise, and personally engage in the smuggling of fentanyl and drug proceeds across the U.S.-Mexico border.[1] A faction of the Cartel is led by the Chapitos, the sons of the Cartel's notorious former leader, "El Chapo."

       Marin Gonzalez was a trade-based money launderer and narcotics trafficker for the Sinaloa Cartel. To assist the Cartel in laundering its narcotics proceeds, Marin Gonzalez used a chain of

---

[1] *See* U.S. Drug Enforcement Administration, National Drug Threat Assessment 2024 at 6, https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf ("The Sinaloa Cartel dominates the fentanyl market through its manipulation of the global supply chain and the proliferation of clandestine fentanyl labs in Mexico. . . . Los Chapitos initially established a base of operations for manufacturing illicit fentanyl in the mountains near Culiacan. Now, they control the procurement of precursor chemicals, largely from China, and direct the production of illicit fentanyl from labs hidden in the mountains of Sinaloa and in other Sinaloa Cartel strongholds throughout Mexico.").

cellphone stores that he owned, called "Smart Depot," in Culiacán and Mazatlán in Sinaloa, Mexico, to purchase bulk quantities of U.S. dollars from Cartel drug traffickers in exchange for Mexican pesos. (May 19, 2026 Final Presentence Investigation Report ("PSR") ¶ 33). Marin Gonzalez also relied on a network of couriers to pick up the drug proceeds and buy large quantities of cellphones that were smuggled back into Mexico and sold by Marin Gonzalez at a profit. (PSR ¶ 33). With the assistance of undercover agents and confidential sources, law enforcement officials picked up a total of approximately $1.3 million of these proceeds on Marin Gonzalez's behalf as part of the laundering scheme. (PSR ¶ 33). After each pickup, a CS purchased cellphones in bulk in the United States and then sent those cellphones to a particular address in San Diego at Marin Gonzalez's direction.  From there, the cellphones were smuggled into Tijuana, from where they were flown into Mazatlán and Culiacán, for Marin Gonzalez to resell at his cellphone stores at an inflated price.

And, while that conduct was bad enough, Marin Gonzalez was not just a money launderer. He also sold or facilitated the sale of large quantities of fentanyl, including approximately 20,000 pills and seven kilograms of powder, which were delivered to undercover agents at locations in California. (PSR ¶ 34). Marin Gonzalez was recorded by law enforcement stating that the fentanyl was sourced from an organization located in Sinaloa, Mexico, and that the money made from his drug sales was used to finance additional bulk cellphone purchases to smuggle back into Mexico. (PSR ¶ 34). He was also responsible for introducing his supplier, Tirado Andrade, to a confidential source (the "CS") and was present for discussions between Andrade and the CS about setting up a fentanyl lab and a potential trade of fentanyl for automatic weapons.

## A.   October and November 2022 Fentanyl Transactions

In August 2022, an undercover officer ("UC") met with Marin Gonzalez at an audio-recorded meeting during which Marin Gonzalez claimed he was not a drug trafficker but that he knew and had access to several drug traffickers in Culiacán.  (PSR ¶ 35). Marin Gonzalez then agreed to contact those drug traffickers to facilitate the sale of narcotics to the UC. (PSR ¶ 35). The UC stated he was looking to purchase fentanyl pills and powder; Marin Gonzalez responded that powder was easier to get and that he knew a person who manufactured fentanyl.  (PSR ¶ 35). Marin Gonzalez and the UC agreed that the UC would conduct money pickups in the United States, including in New York City, for Marin Gonzalez. (PSR ¶ 35).

In late October 2022, in San Diego , the UC purchased approximately 20,000 fentanyl pills from Marin Gonzalez for approximately $14,500, which was later paid to Marin Gonzalez in the form of cellular phones. (PSR ¶ 36).  In early November 2022, in Los Angeles, the UC purchased approximately 5 kilograms of fentanyl powder for approximately $65,000, from Marin Gonzalez, which Marin Gonzalez confirmed were drugs that came from a particular drug trafficking organization in Sinaloa. (PSR ¶ 36).  Of the five kilograms, approximately one kilogram was significantly more potent than the other kilograms, and cost approximately $17,000. The four other kilograms cost approximately $12,000. Marin Gonzalez arranged for the drugs to be provided to the UC. (PSR ¶¶ 36-37).

### B.  January 2023 Fentanyl Transactions

In December 2022, the UC and a confidential source (the "CS") met in person with Marin Gonzalez in New York, New York. During the meeting, Marin Gonzalez discussed selling additional amounts of fentanyl to the UC. (PSR ¶ 38).

In early January 2023, Marin Gonzalez participated in multiple meetings with multiple CSes in Mexico City, Mexico. (PSR ¶ 39).  During one meeting, Marin Gonzalez introduced one of the CSes to his main source of supply for fentanyl, the fentanyl lab operator Tirado Andrade, and then brokered a deal between the CSes and Andrade. (PSR ¶ 39).This resulted in Andrade selling a sample of approximately one kilogram of fentanyl to the CS in the United States. (PSR ¶¶ 38-39).

On January 11, 2023, Marin Gonzalez also arranged for the delivery of approximately one kilogram of fentanyl to the UC for approximately $10,000. (PSR ¶ 40).

### C.  Discussions of a Fentanyl Lab and Automatic Weapons

On January 14, 2023, Marin Gonzalez, the UC, and Andrade discussed a plan to assemble a fentanyl production laboratory in Guatemala. (PSR ¶ 41). The UC claimed to have established business in the New York and Phoenix areas, with plans to expand into Los Angeles. (PSR ¶ 41).Andrade said that he had a laboratory in Culiacán equipped to manufacture at the level of the UC's choosing, but if the UC and his partners were interested in putting a laboratory in Guatemala, the Supplier had means to assist. (PSR ¶ 41).  Andrade also insisted that he controlled the fentanyl manufacturing market and that he could send fentanyl to the United States. Andrade said he had everything at his location and claimed that he had the raw material to produce and move the merchandise. (PSR ¶ 41).

On January 14, 2023, a CS met with Marin Gonzalez and Andrade to discuss both setting up a fentanyl lab and trading fentanyl for automatic weapons. (PSR ¶ 42). The CS suggested paying for fentanyl with automatic weapons, and Andrade agreed.  (PSR ¶ 42).

Marin Gonzalez was present during both discussions of assembling a fentanyl production laboratory. (PSR ¶¶ 41-42).

On February 22, 2023, the UC and Marin Gonzalez discussed an additional sale of fentanyl powder. During their call, Marin Gonzalez agreed to arrange an additional delivery of approximately 100 kilograms of fentanyl powder for the UC in the vicinity of Los Angeles in exchange for cellphones. This transaction was not consummated. (PSR ¶ 43).

## II.  Procedural History Guidelines Calculations

On April 4, 2023, the defendant was charged in five counts of a six-count indictment, including with (1) participating in a conspiracy from at least in or about 2014, up to and including on or about April 4, 2023, to (i) import 400 grams and more of fentanyl into the United States, (ii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl,

intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, and (iii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl on board an aircraft registered in the United States, in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(F) (Count Two); and (2) participating in a money laundering conspiracy, from at least in or about 2014 up to and including on or about April 4, 2023, in violation of Title 18, United States Code, Section 1956(h), with the following four objects: promotional money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); international promotional money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(A); and international concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) (Count Six).

On March 17, 2023, the defendant was arrested in New York City. (PSR ¶ 52). On February 12, 2026, pursuant to a plea agreement with the Government (the "Plea Agreement"), the defendant pled guilty before this Court to a lesser included offense of Count Two, participating in a conspiracy to import at least 40 grams of fentanyl. (PSR ¶ 1). The lesser-included fentanyl importation offense carries a five-year mandatory minimum term of imprisonment.

In the Plea Agreement, the parties stipulated to a total offense level of 33, with a Stipulated Guidelines Range of 135 to 168 months' imprisonment, which matches Probation's calculations. (PSR ¶ 106).

Under U.S.S.G. § 2D1.1, the base offense level is 34 because the defendant conspired to import at least 4 kilograms but less than 12 kilograms of fentanyl pursuant to §2D1.1(a)(5) and (c)(3). (PSR ¶ 59). Under U.S.S.G. § 2D1.1(b)(1), a two-level increase is warranted because a dangerous weapon was possessed—specifically the Sinaloa Cartel's general use of machineguns in furtherance of its drug trafficking during the offense was foreseeable to the defendant, who also participated in at least one meeting himself during which a firearms-for-fentanyl deal was discussed. (PSR ¶ 60). The defendant has demonstrated acceptance of responsibility for the offense and thus the offense level is decreased by two levels, pursuant to U.S.S.G. § 3E1.1(a); and because the defendant timely notified authorities of his intention to enter a plea of guilty the offense level is decreased by one additional level, pursuant to U.S.S.G. § 3E1.1(b). (PSR ¶¶ 66-67).

Probation recommends a sentence of 72 months' imprisonment, followed by four years of supervised release. (PSR at 29).

## III. Relative Culpability

The defendant is one of 23 defendants charged in the same initial Indictment. Of the 23 defendants, seven have been apprehended and are currently in U.S. custody on the charges against them in this case. Most of the top defendants remain at large, including two of the Chapitos and one of their top lieutenants, and three defendants have been reportedly killed in Mexico. Of the 23 defendants, this defendant is among the least culpable, based on his relative role within the Sinaloa Cartel; moreover, unlike many of the defendants charged in this case, this defendant, to the Government's knowledge, was not involved in specific acts of violence. Thus, unlike the Chapitos and their top lieutenants, for example, this defendant is not charged in Count One of the Indictment,

which charges five of the defendants with participating in a continuing criminal enterprise, from at least in or about 2014, to at least on or about April 4, 2023, in violation of Title 21, United States Code, Section 848, based on those defendants' roles as principal administrators, organizers, and leaders of the Sinaloa Cartel.

To date, the Court has sentenced one other defendant whose conduct included both money laundering and fentanyl trafficking, Sergio Duarte Frias. Duarte Frias was sentenced to 80 months' imprisonment and four years of supervised release. (ECF No. 274). As described below, because Marin Gonzalez is more culpable than Duarte Frias, a sentence of more than 80 months is warranted.

## IV.  Discussion

### A.  Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

### B.  A Substantial Sentence Below the Stipulated Guidelines Range Is Warranted

A substantial sentence below the Stipulated Guidelines Range would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

The seriousness of the defendant's conduct warrants a substantial term of imprisonment but one that is below the Stipulated Guidelines Range. The defendant played an important role in the Sinaloa Cartel's massive fentanyl enterprise by using his cellphone business to launder drug proceeds from the United States to Mexico. The Cartel's destructive and far-ranging drug trafficking operations could not exist without the active assistance of associates like the defendant,

who used systematic deception and leveraged his knowledge and skills as a businessman to keep money flowing into the Cartel's coffers.

As the Court is aware, fentanyl is a particularly dangerous substance, and even small amounts can be fatal. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[2] The crisis has only worsened. According to the CDC, in 2023—when the defendant was trafficking fentanyl—for the first time in U.S. history, the overdose death rate topped 112,000 in a 12 month period, with young people and people of color among the hardest hit.[3] The magnitude of this calamity now appears to have eclipsed every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[4] The cost to ordinary families destroyed by the fentanyl crisis is incalculable. The defendant contributed to that crisis for his personal gain.

The defendant's conduct was not confined to moving and concealing illicit proceeds. As his communications and dealings with the UC and CS reveal, he used his access to the fentanyl trade to personally sell, and coordinate the sale of, kilogram quantities of fentanyl—and confirmed his willingness to sell far more and to facilitate introductions that would let *others* maximize their fentanyl footprint. Despite his ability to make a living with a legitimate business, Marin Gonzalez chose to use that business to facilitate the operations of a violent cartel known not only for producing and distributing enormous quantities of dangerous narcotics but also for protecting and promoting that trade with horrific violence that has terrorized and paralyzed entire cities in Mexico.

In 2022 and 2023, the defendant sold thousands of pills of extremely potent fentanyl to the UC on multiple occasions and laundered the proceeds through his cellphone business. (PSR ¶¶ 35-37, 40). The defendant also brokered a fentanyl deal between the CS and his own supplier, Tirado Andrade, and was present when Andrade actively discussed setting up a fentanyl lab in Guatemala with the CS and agreed to trade fentanyl for automatic weapons (PSR ¶ 39, 41, 42). In his sentencing submission, the defendant attempts to distance himself from all discussion of fentanyl

---

[2] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text= Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at *1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal. In 2020, the National Institutes of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[3] Brian Mann & Aneri Pattani, In 2023 Fentanyl Overdoses Ravaged the U.S. and Fueled a New Culture War Fight, Nat'l Pub. Radio, Dec. 28, 2023, https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction (last visited December 9, 2025).

[4] *Id.*

lab operations and the prospective weapons trade, insisting that he "did not participate in that part of the conversation." Def. Br. 4. The problem with this claim is not merely that Marin Gonzalez was present for these discussions—Marin Gonzalez is the broker who knowingly *facilitated* these discussions by connecting what he knew to be a serious fentanyl supplier with his own fentanyl client in the United States. These facts undermine Marin Gonzalez's claim that he was "not principally a narcotics trafficker" for the Cartel. They also make clear that Marin Gonzalez was fully aware that the Cartel he was assisting operated through violence, enforced by firearms. Though he began as a money launderer, who used an ingenious method to systematize the Cartel's ability to realize its profits, it is clear that the defendant then became far more than that, serving as an active participant in the drug side of the operations and working with a lab operator who did not merely aspire to move existing fentanyl but to create more. In short, the defendant had no qualms about personally flooding the United States with fentanyl and furthering the Cartel's reign of death and destruction in Mexico.

The defendant does not deny the seriousness of his conduct but requests a sentence of 60 months based on, among other things, his allegedly less serious conduct relative to co-defendant Duarte Frias, who received 80 months' imprisonment. Def. Br. 7. The Government disagrees with the assertion that the defendant is less culpable than Duarte Frias and does not believe that the defendant is deserving of the dramatic variance to either his own requested 60-month sentence or the 72-month sentence recommended by Probation.

At best, the defendants are similarly culpable: both defendants engaged in significant money laundering, and both personally sold kilogram quantities of fentanyl. But a closer examination of their conduct shows that Marin Gonzalez is more culpable and thus deserving of a longer sentence. First, he sold, and through Andrade facilitated the sale of, far more fentanyl than Duarte Frias: 20,000 pills and six kilograms of fentanyl, over the course of several transactions, in contrast with the approximately 10,000 pills and one kilogram of powder sold by Duarte Frias. Second, one of those kilograms consisted of what Marin Gonzalez knew to be especially potent— and dangerous—as it was accordingly priced at $17,000 instead of $12,000. Third, the defendant also introduced his supplier to the CS and thereby facilitated Andrade's sale of an additional sample kilogram, and as noted above, knowingly enabled further discussions between Andrade and the CS about disturbing conduct involving the establishment of a fentanyl lab and a trade of fentanyl for weapons. As noted above, the defendant's service in brokering the communications between Andrade and the CS cannot be minimized as a minor act. For it is an act that speaks to his willingness to serve as more than a cog in the enormous drug trafficking machine built by the Sinaloa Cartel—it is proof of his willingness to help expand it.

The danger the defendant poses as a deeply embedded player in the Cartel's operations is clear and calls for a sentence that deters him from further criminal conduct. Equally important is the message that his sentence will send to the fentanyl traffickers and launderers who are so crucial to the Cartel's ability to maintain its dominance. The defendant was not a street-level dealer or a courier. He actively contributed, in multiple ways, to the sophistication and potential expansion of what he knew to be a Cartel operation. Violent drug cartels like the Sinaloa Cartel rely on individuals like the defendant to maintain and strengthen their reign of fear. Individuals who are tempted to assist the Sinaloa Cartel in any way—whether by laundering their money, moving or

selling their drugs, or connecting buyers and sellers—should know that they will be held accountable for their actions.

## V.  Conclusion

For the reasons set forth above, a substantial sentence, albeit one below the Stipulated Guidelines Range of 135 to 168 months' imprisonment, would be sufficient but not greater than necessary in this case to meet the goals of sentencing under Section 3553(a).[5]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:  /s/_____
Jane Chong/ Sarah Kushner/ David Robles
Assistant United States Attorneys
(212) 637-2263/-2676/-2250

cc: Lawrence Gerschwer, Esq.
    Damini Kunwar, Esq.

---

[5] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).