

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 24, 2026

**BY ECF**

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Silvano Francisco Mariano, a/k/a "Rayo,"* 23 Cr. 180 (KPF)**

Dear Judge Failla:

The Government respectfully submits this letter in advance of the July 31, 2026 sentencing of defendant Silvano Francisco Mariano, a/k/a "Rayo," following his guilty plea for conspiring to import fentanyl into the United States. For the reasons set forth below, the Government respectfully submits that a sentence within the Guidelines range of 135 to 168 months' imprisonment (the "Stipulated Guidelines Range") calculated and stipulated to by the parties under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines"), would be sufficient but not greater than necessary to achieve the purposes of sentencing.

## I. Offense Conduct

The Sinaloa Cartel (the "Cartel") is a primary distributor of fentanyl to the United States and relies upon, among others, money launderers and traffickers who, among other things, direct, supervise, and personally engage in the smuggling of fentanyl and drug proceeds across the U.S.-Mexico border.[1] A faction of the Cartel is led by two of the Chapitos, the sons of the Cartel's notorious former leader, "El Chapo," Ivan Archivaldo Guzman Salazar ("Ivan") and Jesus Alfredo Guzman Salazar, a/k/a "Alfredo" ("Alfredo"), both charged defendants in this case.

Francisco Mariano and his co-defendant Carlos Omar Felix Gutierrez operated laboratories in Sinaloa for the manufacture and importation of fentanyl on behalf of their co-conspirators and

---

[1] *See* U.S. Drug Enforcement Administration, National Drug Threat Assessment 2024 at 6, https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf ("The Sinaloa Cartel dominates the fentanyl market through its manipulation of the global supply chain and the proliferation of clandestine fentanyl labs in Mexico . . . . Los Chapitos initially established a base of operations for manufacturing illicit fentanyl in the mountains near Culiacan. Now, they control the procurement of precursor chemicals, largely from China, and direct the production of illicit fentanyl from labs hidden in the mountains of Sinaloa and in other Sinaloa Cartel strongholds throughout Mexico.").

the Cartel. Between October 2022 and January 2023, they sold fentanyl to DEA confidential sources in furtherance of future narcotics deals and also discussed the possibility of trading fentanyl for automatic weapons. (PSR ¶ 32).

On October 6, 2022, a DEA confidential source ("CS-1") met with co-defendant Felix Gutierrez in a recorded meeting in Mexico to discuss the purchase of narcotics. During the meeting, Felix Gutierrez stated that he could sell kilograms of fentanyl, fentanyl pills, cocaine, and methamphetamine; he had a smuggling route for these narcotics; and he could deliver the narcotics to any city in the United States that the sources wanted. Felix Gutierrez then discussed the price of fentanyl in the United States, including in New York, and stated that his associate, Francisco Mariano, had direct contact with a significant drug organization based in Sinaloa, Mexico, and stated that he would arrange a meeting between CS-1 and Francisco Mariano. CS-1 mentioned to Felix Gutierrez that CS-1 had access to an individual with a variety of weapons for sale, and Felix Gutierrez said that he would speak with Francisco Mariano about purchasing the weapons. (PSR ¶ 33).

On October 10, 2022, CS-1 consensually recorded an audio call between CS-1 and Felix Gutierrez, during which they discussed the price of one kilogram of fentanyl in San Diego, California.  During the call, CS-1 and Felix Gutierrez also discussed that CS-1 would try to go to Mexico to meet with Felix Gutierrez and Francisco Mariano to discuss the price of fentanyl.  Felix Gutierrez also told CS-1 that he and Francisco Mariano had authorization from a particular drug trafficking organization to process fentanyl in Sinaloa, and that the drug trafficking organization also provided Felix Gutierrez and Francisco Mariano with the chemicals to process fentanyl.  CS-1 and Felix Gutierrez also discussed CS-1 obtaining a sample of fentanyl from Felix Gutierrez and Francisco Mariano. (PSR ¶ 34).

On the same day, Felix Gutierrez sent a text message to CS-1 stating that the price per kilogram of fentanyl was $25,000 in New York and $11,500 in San Diego, California.  Felix Gutierrez agreed to meet with CS-1 again in the near future, along with Francisco Mariano, in Mexico City, to further negotiate the purchase of fentanyl in the United States. (PSR ¶ 35).

On November 3, 2022, CS-1 met in a recorded meeting with Felix Gutierrez and Francisco Mariano in Mexico City. At the meeting, Felix Gutierrez and Francisco Mariano told CS-1 that they had kilograms of fentanyl and cocaine as well as methamphetamine and fentanyl pills for sale in the United States, and could deliver these drugs to any city in the United States. During this meeting, Felix Gutierrez and Francisco Mariano also discussed purchasing weapons from a purported friend of CS-1. Francisco Mariano told CS-1 that he would reach out to a co-conspirator who had been tasked by other members of the conspiracy with sourcing additional firearms, but concluded that the opportunities the co-conspirator found were too expensive. (PSR ¶ 38).

On November 8, 2022, CS-1 spoke with Francisco Mariano and Felix Gutiérrez. Francisco Mariano stated that he knew a person that had kilograms of cocaine in Mexico City ready for purchase. Francisco Mariano also told CS-1 that he knew someone who wanted to purchase weapons and that he was going to see a second person who was also interested in purchasing weapons. Francisco Mariano stated that he was requesting a meeting with the leaders of a particular drug organization based in Sinaloa, Mexico to tell them about the weapons, and also discussed quantities of fentanyl pills that CS-1 was looking to purchase. (PSR ¶ 39).

On January 17, 2023, Francisco Mariano and Felix Gutierrez arranged for CS-1 to receive a one-kilogram sample of fentanyl in San Diego, California, for which DEA paid the courier who arrived with the fentanyl $11,500. The kilogram of fentanyl was seized by DEA. In February 2023, CS-1 sent via electronic communication a receipt of a wire transfer of $925 for partial payment for the drugs; Francisco Mariano confirmed receipt and stated that he was working on withdrawing the money. (PSR ¶ 40-41).[2]

## II. Procedural History Guidelines Calculations

On April 4, 2023, the defendant was charged in five counts of a six-count indictment, including with (1) participating in a conspiracy from at least in or about 2014, up to and including on or about April 4, 2023, to (i) import 400 grams and more of fentanyl into the United States, (ii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl, intending, knowing, and having reasonable cause to believe that it would be unlawfully imported into the United States, and (iii) manufacture, distribute, and possess with intent to distribute 400 grams and more of fentanyl on board an aircraft registered in the United States, in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(F) (Count Two); and (2) participating in a money laundering conspiracy, from at least in or about 2014 up to and including on or about April 4, 2023, in violation of Title 18, United States Code, Section 1956(h), with the following four objects: promotional money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); international promotional money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(A); and international concealment money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) (Count Six).

On March 16, 2023, the defendant was arrested in Mexico. (PSR ¶ 44). On March 5, 2026, pursuant to a plea agreement with the Government (the "Plea Agreement"), the defendant pled guilty before this Court to a lesser included offense of Count Two, participating in a conspiracy to import at least 40 grams of fentanyl. (PSR ¶ 1). The lesser-included fentanyl importation offense carries a five-year mandatory minimum term of imprisonment.

In the Plea Agreement, the parties stipulated to a total offense level of 33, with a Stipulated Guidelines Range of 135 to 168 months' imprisonment, which matches Probation's calculations. (PSR ¶ 101).

Under U.S.S.G. § 2D1.1, the base offense level is 34 because the defendant conspired to import at least 4 kilograms but less than 12 kilograms of fentanyl pursuant to §2D1.1(a)(5) and (c)(3). (PSR ¶ 57). Under U.S.S.G. § 2D1.1(b)(1), a two-level increase is warranted because a dangerous weapon was possessed—specifically the Sinaloa Cartel's general use of machineguns in furtherance of its drug trafficking during the offense was foreseeable to the defendant. (PSR ¶ 58). The defendant has demonstrated acceptance of responsibility for the offense and thus the offense level is decreased by two levels, pursuant to U.S.S.G. § 3E1.1(a); and because the

---

[2] A cooperating witness has identified Francisco Mariano as a longtime member of the Cartel, whose membership and association with Cartel leadership dates back to at least approximately 2016, when Francisco Mariano served as a secretary of the Cartel's former leader, El Chapo.

defendant timely notified authorities of his intention to enter a plea of guilty the offense level is decreased by one additional level, pursuant to U.S.S.G. § 3E1.1(b). (PSR ¶¶ 64-65).

Probation recommends a sentence of 84 months' imprisonment, followed by four years of supervised release. (PSR at 29).

## III. Relative Culpability

The defendant is one of 23 defendants charged in the same initial Indictment. Of the 23 defendants, eight have been apprehended and are currently in U.S. custody on the charges against them in this case, four have been killed in Mexico since the charges against them were filed, and 11 remain at large, including two of the Chapitos . This defendant is less culpable than the Chapitos and their top lieutenants charged in this case. Thus, unlike the Chapitos and their top lieutenants, this defendant is not charged in Count One of the Indictment, which charges five of the defendants with participating in a continuing criminal enterprise ("CCE"), from at least in or about 2014, to at least on or about April 4, 2023, in violation of Title 21, United States Code, Section 848, based on those defendants' roles as principal administrators, organizers, and leaders of the Cartel.

To date, the Court has sentenced four other defendants in the case. Their offense conduct included money laundering and/or fentanyl trafficking.  In an effort to capture the relative culpability of the defendants, the Government has arranged the defendants into three groups of similarly situated defendants.  Group One includes the defendants charged in the CCE Count who were leaders or high-level members of the Cartel and who committed or directed the most serious violence in this case.  Group Two includes the defendants primarily involved in drug trafficking and money laundering for the Cartel.  Group Three includes the defendants primarily involved in brokering or supplying fentanyl precursor.  Within each group, the defendants are further arranged in *generally* descending order of culpability. The tables below reflect these groups. The Government will update these tables in future sentencing submissions to reflect the sentences imposed.[3]

### **Group 1**

| Defendant | CHC | Guidelines Range | Man. Min. | Sentence |
|---|---|---|---|---|
| Ivan Archivaldo Guzman Salazar | | | | |
| Jesus Alfredo Guzman Salazar, a/k/a "Alfredo" | | | | |
| Oscar Noe Medina Gonzalez, a/k/a "Panu"+[4] | | | | |
| Nestor Isidro Perez Salas, a/k/a "Nini" | | | | |
| Jorge Humberto Figueroa Benitez, a/k/a "27"+ | | | | |

---

[3] The Government reserves the right to reorder defendants as its analysis of the evidence continues in advance of trials in this case.

[4] The notation + denotes that the defendant is reportedly deceased.

## Group 2

| Defendant | CHC | Guidelines Range | Man. Min. | Sentence |
|---|---|---|---|---|
| Liborio Nunez Aguirre, a/k/a "Karateca" | | | | |
| Noel Perez Lopez, a/k/a "Tio" | | | | |
| Samuel Leon Alvarado | | | | |
| Luis Javier Benitez Espinoza, a/k/a "El Fourteen"+ | | | | |
| Alan Gabriel Nunez Herrera+ | | | | |
| Juan Pablo Lozano, a/k/a "Camaron" | VI | 360 to 480 months | 60 months | 175 months |
| Carlos Limon | | | | |
| Jesus Tirado Andrade | | | | |
| Carlos Omar Felix Gutierrez | | | | |
| Silvano Francisco Mariano, a/k/a "Rayo" | | | | |
| Julio Marin Gonzalez | I | 135 to 168 months | 60 months | 80 months |
| Mario Alberto Jimenez Castro, a/k/a "Kastor" | | | | |
| Sergio Duarte Frias | I | 135 to 168 months | 60 months | 80 months |

## Group 3

| Defendant | CHC | Guidelines Range | Man. Min. | Sentence |
|---|---|---|---|---|
| Ana Gabriela Rubio Zea, a/k/a "Gaby" | I | 108 to 135 months | | ~36 months |
| Kun Jiang | | | | |
| Yonghao Wu, a/k/a "Tim" | | | | |
| Yaqin Wu, a/k/a "Lily" | | | | |
| Huatao Yao, a/k/a "Yao" | | | | |

The two sentenced defendants whose conduct most closely resembled that of Francisco Mariano are Sergio Duarte Frias and Julio Marin Gonzalez, who both trafficked fentanyl and laundered money for the Sinaloa Cartel. Each was sentenced to 80 months' imprisonment and four years of supervised release. (ECF Nos. 274, 348). Francisco Mariano, however, is more culpable than those two defendants because of his role in operating fentanyl labs for the Cartel and his close connections to Cartel leadership.

## IV. Discussion

### A. Applicable Law

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing

decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

### B.  A Sentence Within the Stipulated Guidelines Range Is Warranted

A Guidelines sentence would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

The seriousness of the defendant's conduct warrants a substantial term of imprisonment within the Guidelines range of 135 to 168 months' imprisonment. The defendant played an important role in the Cartel's massive fentanyl enterprise by operating laboratories where the fentanyl was produced. Not only did he help produce the fentanyl, but the DEA investigation revealed that he also personally participated in selling it. In addition, recorded calls show that Francisco Mariano was also willing to facilitate weapons sales. The Cartel's destructive and far-ranging drug trafficking operations could not exist without the active assistance of individuals like the defendant, who is far more culpable than any street dealer, courier, or go-between in that he was responsible for both the production and sale of a poison that has flooded the United States and contributed to the deterioration of communities in Mexico that are terrorized by the Cartel and its sicarios to this day. Further, his willingness to facilitate weapons trades for the Cartel demonstrates his awareness of the Cartel's use of force and violence to promote and protect his drug operations.

As the Court is aware, fentanyl is a particularly dangerous substance, and even small amounts can be fatal. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of over 107,000 deaths from drug overdoses in 2022, it is estimated that 80,590 of these deaths, or 75%, involved at least one opioid, with 71,450, or 66.5%, involving synthetic opioids, primarily from fentanyl or fentanyl analogues.[5] The crisis has only worsened. According

---

[5] *See* CDC, Fighting Fentanyl: The Federal Response to a Growing Crisis, July 26, 2022 (statement of Christopher M. Jones, Acting Director of National Center for Injury Prevention and Control, CDC), *available at* https://www.cdc.gov/washington/testimony/2022/t20220726.htm#:~:text= Together%20we%20can%20stop%20drug,months%20ending%20in%20January%202022; *see also United States v. Herrera*, No. 21 Cr. 750 (LJL), 2023 WL 3862695, at \*1 (S.D.N.Y. June 7, 2023) ("[Fentanyl] can be extraordinarily dangerous and is lethal.  In 2020, the National Institutes

to the CDC, in 2023—when the defendant was trafficking fentanyl—for the first time in U.S. history, the overdose death rate topped 112,000 in a 12 month period, with young people and people of color among the hardest hit.[6] The magnitude of this calamity now appears to have eclipsed every previous drug epidemic, from crack cocaine in the 1980s to the prescription opioid crisis of the 2000s.[7] The cost to ordinary families destroyed by the fentanyl crisis is incalculable. The defendant contributed to that crisis for his personal gain.

The defendant does not deny the seriousness of his conduct but requests the mandatory minimum sentence of 60 months' imprisonment, based on, among other things, his allegedly less serious conduct relative to co-defendant Julio Marin Gonzalez, who received 80 months' imprisonment for trafficking 20,000 counterfeit pills and seven kilograms of fentanyl powder and laundering proceeds for the Cartel. Def. Br. 7.

The Government strongly disagrees with the assertion that the defendant is less culpable than Marin Gonzalez and does not believe that the defendant is deserving of the dramatic variance to either his own requested 60-month sentence or the 84-month sentence recommended by Probation. The Cartel's clandestine labs are where precursor chemicals from China are used to produce and package fentanyl. They are the backbone of the Cartel's entire drug enterprise and the source of its profits. It would be fair to describe the labs as ground zero for the misery and devastation wrought by the Cartel's drug empire. Francisco Mariano's sentence should be commensurate to his role in that enterprise as one of the people the Cartel relied upon to produce its dangerous product. Indeed, a cooperating witness identified Francisco Mariano as a longtime member of the Cartel, responsible for working closely with the Cartel's leadership, including El Chapo.

As Judge Scheindlin has explained, "[t]here are many roles in a conspiracy." However, "[t]he most culpable conspirator is usually the supplier, the conspirator who controls large quantities of drugs." *United States v. Sanchez*, 925 F. Supp. 1004, 1013 (S.D.N.Y. 1996), adhered to on reconsideration (May 2, 1996). So it is here. Francisco Mariano, as a fentanyl lab operator, was definitionally a supplier. He and his fellow lab operators, including his co-defendant Felix Gutierrez, were responsible for creating wholesale quantities of the product sold by members and associates of the Cartel, and his sentence must reflect his high degree of culpability relative to individuals lower in the supply chain.

In other words, although Francisco Mariano was not as culpable as the masterminds of the scheme—the leaders of the Cartel—he cannot be described as a low-level trafficker or compared to those who merely moved or even sold drugs. The defendant was responsible for producing, in

---

of Health reported that synthetic opioids, primarily fentanyl, caused the most drug overdose deaths in the United States, with approximately 56,516 such deaths documented that year. Fentanyl can wreak[] havoc on entire communities . . . [and] destroy[] lives.").

[6]Brian Mann & Aneri Pattani, In 2023 Fentanyl Overdoses Ravaged the U.S. and Fueled a New Culture War Fight, Nat'l Pub. Radio, Dec. 28, 2023, https://www.npr.org/2023/12/28/1220881380/overdose-fentanyl-drugs-addiction (last visited December 9, 2025).

[7] *Id.*

wholesale quantities, a dangerous drug that has harmed thousands of victims. Individuals who are tempted to assist the Cartel in any way—including by producing the poison that is the source of their profits—should know that they will be held accountable for their actions. The danger the defendant poses as a deeply embedded player in the Cartel's operations is clear and calls for a sentence that deters him from further criminal conduct. Equally important is the message that his sentence will send to the laboratory operators who remain so crucial to the Cartel's ability to maintain and grow its drug empire.

## V.  Conclusion

For the reasons set forth above, a sentence within the Stipulated Guidelines Range of 135 to 168 months' imprisonment would be sufficient but not greater than necessary in this case to meet the goals of sentencing under Section 3553(a).[8]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:  /s/_____
Jane Chong/ Sarah Kushner/ David Robles
Assistant United States Attorneys
(212) 637-2263/-2676/-2250

cc: Christine Delince, Esq.

---

[8] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).